COMMONWEALTH *vs.* DAVID SMITH.

Suffolk.    November 20, 1985. — February 19, 1986.

Present: BROWN, KAPLAN, & WARNER, JJ.

*Evidence*, Relevancy and materiality, Photograph. *Error*, Harmless. *Robbery. Larceny.*

At the trial of an armed robbery case at which the defendant did not dispute that he had been present at the scene of the crime, claiming only that he had not participated in the events in question, there was reversible error in the admission of a police photograph of the defendant which was assumed to have been taken after the defendant's arrest for the robbery, but which, as revealed during defense cross-examination of a police officer, was actually taken some two years earlier. [622-623]

At the trial of an armed robbery case, evidence that an unarmed police officer posing as an inebriated derelict was lying on a bench in a subway station in the early hours of the morning while two other officers were stationed at some distance, and that the defendant held a knife pointed at the head of the officer lying on the bench while an accomplice rolled the officer and took his wallet, warranted a finding of guilty. [623-624]

· INDICTMENT found and returned in the Superior Court on March 8, 1978.

The case was tried before *Herbert Abrams*, J.

*Brownlow M. Speer*, Committee for Public Counsel Services (*James E. Small, Jr.*, with him) for the defendant.

*Marcy Cass*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   Upon this appeal by the defendant from a judgment of conviction of armed robbery, we summarize the material testimony; then hold there was error, requiring reversal of the judgment, in the handling of a certain photograph of the defendant; and, finally, reject a contention that at a new trial the crime charged must be reduced from armed robbery to larceny from the person.

1. About 2:30 A.M., December 17, 1977, M.B.T.A. police officers Robert Bond, John McKenna, and William Brackett, clad in shabby, soiled, civilian clothes, appeared at the Arlington subway station at Boylston and Arlington Streets in Boston. Bond, unarmed, lay down on a bench on the inbound side of the train platform, feigning an intoxicated sleep or stupor; he had planted an empty liquor bottle on the floor nearby. McKenna and Brackett took up positions at separate points on the outbound side, each about forty feet distant from Bond, from which they could observe Bond and his environs. Around 3:30 A.M., the defendant Smith, a black man in his early twenties, came down the stairway at one end of the outbound platform, reconnoitered, crossed the tracks, mounted the inbound platform, observed and went by Bond, turned, walked past Bond in the opposite direction, and then went up the inbound stairway. Shortly, the defendant and another person were observed standing together on the stairway landing.[1] That other person, a young white man, came down the stairs, walked by Bond, then returned and shook or "jostled" Bond. Bond did not react. In response to a gesture by the white man, the defendant joined him at Bond's bench. The white man rolled and "frisked" Bond while the defendant, at close quarters, drew out a knife and pointed it at Bond's head. The white man found a wallet in Bond's rear left pants pocket. The two withdrew a few feet to examine the contents of the wallet.[2] At this point Bond rose and shouted, "police officer." As the white man dropped the wallet, and the defendant cast the knife onto the tracks, McKenna and Brackett with drawn weapons converged on the spot.[3] The white man ran down the platform but was quickly apprehended by Bond. Brackett arrested the defendant, who was walking briskly away. The wallet and knife were retrieved.

[1] McKenna had only a partial view of the men on the landing, Brackett a full view.

[2] The wallet contained seventeen dollars and was itself valued at eight dollars.

[3] Brackett was so placed that he had to jump over a fence between the inbound and outbound tracks in order to reach the inbound platform.

Bond testified that he had opened his eyes "a little" when he was first "jostled," but was not nervous. He became "nervous" when he heard two sets of footsteps approaching, and was "very nervous" when, opening his eyes, he saw the white man in the process of taking the wallet and the defendant with the knife extended. On cross-examination, Bond expressed himself slightly differently, indicating that, upon opening his eyes, he saw the white man already holding the wallet, and the defendant with the knife extended; at that point, seeing the knife, he was "afraid." He allowed time for the two men to withdraw a bit before he stood up and announced himself.

The foregoing is a sketch of the facts as testified to by the three officers and as the jury could find them.

The defendant testified on his own behalf. Around midnight, he said, he was having a few beers at a bar with a friend. They went to the King of Pizzas across from the Trailways terminal. Then, alone, he went to a bar nearby, and thereafter to the Arlington station, intending to go home. He was "kind of buzzed." He went down the inbound stairway but before reaching the train platform he asked a fellow whether the trains were running and was told no. As he turned, he heard the shout "halt" and was arrested. He asked why. The officer said, for "watching out." He saw a commotion at one of the benches but had no connection with it. He had no knife.

2. In an interval during the direct examination of Bond, the prosecuting attorney said at the sidebar that she intended to offer a police photograph of the defendant which, she asserted, had been taken at approximately the time when the defendant was booked. She indicated that she had intended to offer the picture in response to an anticipated attack by the defendant on the officers' identification of him. She now understood that the defendant was disclaiming any challenge to the identification, which was being made by all three officers (similar identification had been made at the preliminary hearing at the Boston Municipal Court). Nevertheless, she still proposed to offer the picture, but for a (nominally) different purpose — to establish what the defendant looked like at the time of the crime some six years back. Over objection, the judge decided

to allow the picture (as "sanitized") to come in for that purpose. In so deciding, the judge apparently assumed that the picture had been taken at or just after the booking. (The evidence showed that the defendant was not photographed when he was booked at M.B.T.A. headquarters; he was photographed shortly after the booking at District 4 of the Boston police department.)

Resuming the direct examination of Bond, the prosecution (over further objection) elicited from Bond that the picture resembled the defendant as of the time of the crime. The picture was then received in evidence.

The defendant's counsel, commencing cross-examination of Bond, put a few preliminary questions about the picture. Immediately, a state of facts emerged different from that indicated by the prosecutor and evidently accepted by the judge. The picture had been taken in January, 1976, nearly two years before the incident at Arlington station. (At a later point in Bond's testimony, January was ambiguously related to 1977, but this was still well before the date of the crime in suit.) Bond said he had turned the picture over to the prosecutor.

There was no purpose or need for the introduction of the picture, since the identification of the defendant as the alleged guilty person was conceded by the defense. See *Commonwealth v. Yelle*, 19 Mass. App. Ct. 465, 466-472 (1985). Compare *Commonwealth v. Barrett*, 386 Mass. 649, 652 (1982), with *Commonwealth v. Weaver*, 395 Mass. 307, 309-310 (1985).[4] The picture had no, or minimal, probative value; but it was freighted with prejudice against the defendant. This was so as the matter stood upon the direct examination of Bond, for the jury could well surmise that the picture originated with the police, and, since the time of its taking was left uncertain, the jury could suppose that it was taken before the episode at Arlington station

---

[4] " [I]n order for mugshots to be admitted, *the government must demonstrate a need to introduce them,* they must not imply a criminal record, and the manner surrounding their introduction must not call attention to the source from which they came." *Commonwealth v. Rodriguez*, 378 Mass. 296, 309 (1979) (emphasis added), approving a similar statement in *United States v. Fosher*, 568 F.2d 207, 214 (1st Cir. 1978).

and was related to some anterior criminality. The picture should have been excluded at the outset. The error and mischief were compounded when surmise or supposition on the part of the jury was subsequently turned into fact: it became clear that the picture came from the police, and that it had been taken well before December 17, 1977. An ironic note is added by the circumstance that the court had allowed a motion in limine by the defendant to exclude evidence of any prior criminal record. The case is simply one where prejudice has been injected through the unjustified disclosure of the defendant's prior criminal involvement. See *Commonwealth* v. *Nassar*, 351 Mass. 37, 44-46 (1966); Liacos, Massachusetts Evidence 149-154 (5th ed. 1981 & Supp. 1985). Nor can it fairly be said that the error (especially as aggravated) was harmless. Contrast *Commonwealth* v. *Barrett*, 386 Mass. at 652-653. An attempt to rectify the mistake after it was made, e.g., by instructions, would likely have worsened the situation. See *Commonwealth* v. *Whitehead*, 379 Mass. 640, 661 (1980).[5]

3. We disagree with an argument on the part of the defense that at retrial the defendant may not be charged with armed robbery (but could be charged with larceny from the person). The argument assumes that the Commonwealth's substantive proof, as it appears on the present record, was not sufficient to support the jury verdict, and that the judge erred in denying the defendant's motions for a required finding. The judge charged, without objection, on armed robbery[6] and on the lesser included offense of larceny from the person, and the jury found the more serious offense. The evidence is to be taken in the light most favorable to the Commonwealth. See *Commonwealth* v. *Funches*, 379 Mass. 283, 294 (1979). The

---

[5] Defense counsel is not chargeable with contriving reversible error. On the other hand, the prosecution might have been expected to avoid a needless, tendentious gesture, and in any event to make due inquiry about the source of the picture it chose to offer.

[6] The charge conformed to the usual description of robbery as consisting of a larceny from the person by force and violence or by assault and putting in fear. See G. L. c. 265, § 17 (armed robbery), § 19 (unarmed robbery); G. L. c. 277, § 37 (construction of robbery as used in indictment).

jury could understand "nervousness" and "fear" in a common-sense way and find that Bond was in a mounting condition of fear from the moment the white man, reaching his side in the company of the defendant, began to roll and frisk him, to the time, a few moments later, when he opened his eyes and perceived the knife in the defendant's hand pointed at him.[7] Bond's fear was not implausible: he was unarmed, and aid was forty feet away. Further, the jury could see the episode as a continuum and reject as a manufactured abstraction, contrary to the facts, the idea, now pressed by the defense, that "fear" began only after — it must at best have been a split second after — a completed taking of the wallet. The rolling and frisking itself — especially as it occurred in an ambience of fear — could be found to be the force and violence sufficient for robbery: this was not a case of pickpocketing, whose essence is stealth. For the distinction in this jurisdiction, see *Commonwealth* v. *Jones*, 362 Mass. 83, 88-89 (1972).[8] So also, an assault and putting in fear could be found in Bond's apprehension of the knife or, indeed, in the total situation. See the discussion and contrasting facts in *Commonwealth* v. *Novicki*, 324 Mass. 461, 463-465 (1949); see also *Commonwealth* v. *Boiselle*, 16 Mass. App. Ct. 393, 399-400 (1983). Cf. *Commonwealth* v. *Marcotte*, 18 Mass. App. Ct. 391, 395 n.2 (1984). Finally, there is no claim, nor could there be, that the fact that Bond was serving as a "decoy" negates any requisite element of the crime of robbery.[9]

*Judgment reversed.*

*Verdict set aside.*

---

[7] Of course, the jury could find a joint venture between the white man and the defendant. The judge charged on joint venture.

[8] Compare *Commonwealth* v. *Brown*, 2 Mass. App. Ct. 883, 884 (1974), with *Commonwealth* v. *Davis*, 7 Mass. App. Ct. 9, 11-12 (1979). Cf. *Commonwealth* v. *Correia*, 17 Mass. App. Ct. 233, 236 n.8 (1983); *Commonwealth* v. *Assad*, 19 Mass. App. Ct. 1007, 1008-1009 (1985).

[9] See Note, Entrapment, 73 Harv. L. Rev. 1333, 1337 (1960).