COMMONWEALTH vs. SHIRLEY JAY McGEE.

No. 95-P-1182.

Suffolk. March 12, 1997. - May 29, 1997.

Present: ARMSTRONG, KAPLAN, & GREENBERG, JJ.

*Witness,* Recalling, Impeachment. *Evidence,* Impeachment of credibility,
   Prior inconsistent statement.

In a rape case, the judge correctly denied the defendant's motion to recall
   the victim to elicit a denial that she had intercourse with anyone other
   than the defendant in order to create a basis for impeachment, where
   the proffered testimony did not prove a prior inconsistent statement of
   the victim nor did it indicate that the victim's complaints against the de-
   fendant were untrue. [745-748]

INDICTMENTS found and returned in the Superior Court
Department on March 2, 1993.

The cases were tried before *Patrick F. Brady,* J.

*Sharon J. Fray-Witzer,* Assistant District Attorney, for the
Commonwealth.

*Benjamin H. Keehn,* Committee for Public Counsel Ser-
vices, for the defendant.

KAPLAN, J. The defendant, who is the victim's stepfather,
appeals from convictions of rape of a child (G. L. c. 265,
§ 23) and indecent assault and battery on a child under the
age of fourteen (G. L. c. 265, § 13B). There was evidence
that he had intercourse with the victim repeatedly from the
time she was seven or eight years old until she was close to
eleven in January, 1992. The defendant contends on appeal
that the judge erred in declining to permit him to present an-
other girl who presumably would testify that the victim told
her she had intercourse with a boy at a time after the defen-
dant allegedly committed the acts and the victim made "fresh
complaints." We affirm the convictions.

At the time of trial in February, 1995, the victim (whom

we call "Sara") was thirteen years old and in the eighth grade. Sara said on direct examination that when she was about six years old and home alone with the defendant, he called her into his bedroom and told her to take her clothes off. He took off his clothes and told her to get into bed. She did but knew something was wrong, said "no," and went to her room. There was no sexual contact. When Sara was seven or eight and she and her mother and the defendant had moved to another address, the defendant one day called her into his room and asked, "Did you ever tell anybody what happened before?" She said, "No." He told her to take off her clothes and removed his own. He "proceeded into intercourse." She was screaming and crying because it hurt. From then on, in the various places to which the family moved, the defendant had intercourse with her many times — often more than once a week. Usually this happened after she returned from school and while her mother was at work (the defendant was not employed on a consistent basis). The last time the defendant abused her was in January, 1992, just before the defendant and her mother separated and he left the house. Beginning in February, 1992, she told a downstairs neighbor, her fifth grade teacher, her mother, and social workers of the Department of Social Services (DSS) about these repeated occasions of intercourse with the defendant. She had lived continuously with her mother until July, 1992; she left then because her mother "beat me up."

On cross-examination, Sara allowed there were two extended periods when her mother and the defendant were separated in which she was free of the defendant's abuse. She never told her story to anyone while the abuse continued, although she had been candid with DSS in 1991 that her mother had beaten her. She was afraid of the defendant and he told her not to tell her mother or anybody else. Usually she got home from school about 3:35 P.M. and the defendant would often leave home to pick up her mother from work at 4:30 P.M. She "cried and screamed" during instances of intercourse, yet no neighbor responded in the apartment building or multiple family dwelling in which they lived. On a day in July, 1992, she let three boys, twelve or thirteen years old, into the house for about an hour and a half; her mother returned to find the house ransacked. It was then that her mother ordered her out. She went to stay with relatives.

Cross-examination elicited from Sara that during a counseling session with Dr. Donna Lobiondo, a psychologist, in July, 1993 (she had entered counseling in May, 1993), she said she wasn't completely sure she had not made up her account of what the defendant had done to her. In subsequent testimony by Dr. Lobiondo about the counseling it appeared Sara also said part of her was certain that the abuse had happened.

At the conclusion of Sara's testimony, the Commonwealth indicated at sidebar that it intended to call a pediatrician who would testify to the results of a gynecological examination she had performed on Sara in October, 1992. The defendant had been put on notice the witness would report that she found an enlarged vaginal opening and there was evidence of a sexually transmitted disease. The Commonwealth argued the testimony was relevant because one would not expect to find these conditions in an eleven year old who had not been abused. The defendant contended that this subject matter was not admissible under the rape shield law,[1] and, moreover, was either irrelevant or more prejudicial than probative because the examination occurred more than nine months after the defendant had last seen Sara. The judge said the statute did not bar the evidence; the prosecutor was not offering it to show that the victim was unchaste. "[W]hat the doctor is going to testify to is consistent with the witness's [Sara's] testimony although it doesn't prove it completely . . . . If the defendant wishes to recall the complaining witness to question her about other sexual activity I will permit that. I think that, under these circumstances, it [other sexual activ-

---

[1]"Evidence of the reputation of a victim's sexual conduct shall not be admissible in any investigation or proceeding before a grand jury or any court of the commonwealth for a violation of sections thirteen B . . . [or] twenty-three . . . of chapter two hundred and sixty-five . . . . Evidence of specific instances of a victim's sexual conduct in such an investigation or proceeding shall not be admissible except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof. If, after said hearing, the court finds that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim, the evidence shall be admitted; otherwise not. If the proceeding is a trial with jury, said hearing shall be held in the absence of the jury. The finding of the court shall be in writing and filed but shall not be made available to the jury." G. L. c. 233, § 21B, as amended by St. 1983, c. 367.

ity] has to fall under the exception of the rape shield act.[2] I don't think that it would be right for me to permit this testimony [offered by prosecutor] without permitting the defendant to go into other possible explanations for her physical condition."[3]

Dr. Julia Jankelson of Acton Medical Associates then testified that in September, 1992, she conducted a routine physical examination of Sara with normal results. In October, 1992, she made a pelvic examination: "[T]he vaginal opening was larger than I would have expected for a patient her age. . . . I would estimate that it was about three centimeters open. . . . Normal for a person her age would be about one to one and a half centimeters." The doctor inserted a speculum and there was no resistance. She said she had never done an internal pelvic examination of a child eleven years or younger. Over objection and a motion to strike, she explained that "[e]leven year old girls rarely have a gynecological problem and they are not usually sexually active." Dr. Jankelson obtained a pap smear and a culture for gonorrhea and chlamydia. Dr. Charles Huizenga, chief of pathology at Emerson Hospital, testified that analysis of the pap smear disclosed the presence of trichomonades, a sexually transmitted protozoan.

The Commonwealth called Sandy Mahoney, a DSS social worker, who testified that Sara told her in October, 1992, that she had had sexual intercourse with the defendant over three to four years. Mahoney also interviewed the defendant. He denied the accusation and intimated that it originated in a bad fight he had with the mother. Sara's fifth grade teacher testified to Sara's "fresh complaint" in April, 1992.

Defense counsel at sidebar requested recall of Sara before the jury so that he might ask her whether she had had intercourse with anyone besides the defendant before the time of

[2]Evidently the exception for "evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition."

[3]There had been discussion of the same issue earlier, after the opening arguments. The judge had expressed doubt whether the subject matter could be admitted under *Commonwealth* v. *Elder*, 389 Mass. 743, 753 (1983), which stated that evidence of lack of virginity should ordinarily not be admitted because of its tenuous connection to a charge of rape. But if the doctor's testimony was admitted, said the judge, it would open the door to the defendant's putting in evidence of the victim's other sexual activity, if any. The judge allowed a motion by the defendant on that contingent basis.

the gynecological examination; counsel was particularly interested in exploring the ransacking incident of July, 1992. Counsel said he had a witness "Carrie" (a fifteen year old friend of the defendant's nieces) who would be expected to testify that Sara had told her she had had sex with one of the boys. The judge was dubious about the value of Carrie's story as evidence. He tested the waters by conducting a voir dire. Under questioning by defense counsel, Sara denied having sex with anyone (other than the defendant) during the period of time she lived with the defendant until the date of Dr. Jankelson's examination. She denied ever telling Carrie she had had sex with one of the boys. Carrie did not testify but defense counsel made an offer of proof. On this showing the judge denied the request to recall Sara or to call Carrie. The defendant objected that once the medical evidence came in, the Commonwealth was able to leave the jury with the notion that only the defendant could be responsible for Sara's condition. The judge responded: "Let me point out that if you did have admissible evidence that she was having sexual intercourse [which could attribute Sara's condition to someone other than the defendant] . . . I would allow you to introduce [it]. However, your offer of proof with respect to [Carrie] is not admissible evidence and since we have just heard from [Sara] she denies the question [*sic*: denies other sex]. So you haven't given me any admissible evidence. So that is the basis of my ruling." The defense objected, foreshadowing its central point on appeal.

The defense, on its part, called the defendant's sister, who had been close to Sara; although Sara complained to her about her mother's beatings, she never mentioned sexual abuse by the defendant. The witness said the defendant at various times from 1988 to 1992 held jobs which required that he be out of the house during the hours when the abuse supposedly occurred. The defense called Sara's mother. The defendant, she said, was using drugs and alcohol while he lived with her (Sara testified he was high or drunk during episodes of abuse), but the witness never observed that the defendant was abusive of Sara, physically or sexually. She said Sara did not complain to her about the defendant's behavior until late February. There was testimony by the defendant's half brother and mother, and the defendant rested.

In his closing argument to the jury, defense counsel argued that the defendant had never abused Sara. As to the medical findings, "You recall that [the examination] occurred in October of 1992. This occurred almost ten full months after . . . McGee had even lived in the same household with [Sara]. It occurred during a period of time when her custodial situation, I submit, was in chaos. She lived with her mother. She testified that her mother came home and the mother threw her from the house, she said because she had three boys in the house at that time."

The prosecutor, in closing, urged the jury to find Sara a credible witness. As to Dr. Jankelson's observation of an enlarged opening, he said, "Something was placed in her vagina, I submit. [Sara] said it was his penis and that it happened for several years between 1988 and 1992 just before he left the home." And finally: "She had a sexually transmitted disease months later. Time is not an element. Time is not a concern. She did not get rid of the disease. She had it in October when she was examined. The only way you get that disease trichomonades is through sexual contact. Sexual contact with this defendant right there and no one else." Counsel objected to the prosecutor's last remark, claiming that the linking of the defendant to the sexually transmitted disease had no support in the evidence. The judge held that neither counsel had exceeded proper argument. He charged that statements of counsel were not evidence. The jury brought in guilty verdicts and judgments entered accordingly.

On this appeal the defendant does not claim the judge erred in admitting the medical evidence tendered by the Commonwealth; were he to make the claim, we would reject it for the reason assigned by the judge, that this evidence offended no statute and tended to support the victim's assertions of sexual abuse.

There is no profit in worrying the point whether the voir dire was strictly under the rape shield statute or under general auspices.[4]

To go on to the meat, the judge was right to refuse to allow recall of Sara. The judge could anticipate, in light of the voir

---

[4]It is doubtful that the defendant's motion (see note 3, *supra*) could serve as the writing required of a movant by the statute, and the statute was ignored when the voir dire was held in court, not in camera, and the judge omitted to file findings in writing.

dire, that if recall were allowed, Sara would deny any extraneous intercourse and deny that she had told Carrie she had had sex with one of the boys. This would be followed by Carrie's taking the stand and contradicting Sara on the latter point.

It is evident that Carrie's statement could not be received as proof that Sara had in fact had the sexual encounter; in that aspect Carrie's statement would be inadmissible hearsay. The judge recognized this when he explained his denial of the motion to recall.

Carrie's testimony could not impeach Sara by proving a prior inconsistent statement: Sara had made no pertinent prior statement outside a courtroom.

And it would be bad practice to allow Sara to be recalled on the part of the defense to take the stand for the purpose of eliciting a statement from her that could then be met by Carrie's testimony — offered nominally for impeachment purposes, but perhaps with some hope that the jury might take it as proof of the matter, which would be a betrayal of the hearsay policy.

Under G. L. c. 233, § 23, a party may impeach his own witness with prior inconsistent statements. Yet in *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111 (1992), our court held, following copious authority elsewhere,[5] that the prosecutor was forbidden to call a witness, who would furnish no probative testimony, for the purpose of creating a basis for impeaching him with a prior inconsistent statement.[6] This shuffling procedure has also been disfavored when attempted by the accused rather than the prosecutor. See *United States* v. *Fay*, 668 F.2d 375, 378-379 (8th Cir. 1981); *United States* v. *Sebetich*, 776 F.2d 412, 428-429 (3d Cir. 1985), cert. denied, 484 U.S. 1017 (1988); *United States* v. *Grooms*, 978 F.2d 425, 428-429 (8th Cir. 1992). The present is hardly an occasion for a change of attitude. The impeachment, if allowed, would be at most on a collateral matter and do nothing to indicate that Sara's complaints against the defendant were untrue. And we have noted the tendentious character of such an impeachment.

[5]See *United States* v. *Morlang*, 531 F.2d 183, 188-190 (4th Cir. 1975); *United States* v. *Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984).

[6]See *Benoit* distinguished where the witness was not called for the very purpose of impeaching her, *Cramer* v. *Commonwealth*, 419 Mass. 106, 111 n.3 (1994).

The defendant cites *Commonwealth* v. *Thayer*, 20 Mass. App. Ct. 234 (1985), for the heroic argument that he needed no denial by Sara of sexual activity with others before he could·offer her inconsistent statement through Carrie. In *Thayer*, the defendant and his friend Kelley were charged with the rape of the complainant, who had been involved in a sexual relationship with Kelley. We held that the defendant should be permitted to introduce testimony by one Silva that he had seen the complainant in the company of Kelley and the defendant two days after the alleged rape; also, that he had asked the complainant why she had accused Kelley and she responded "she didn't think it would go that far and she didn't mean anything by it." *Id.* at 236. We wrote, "[W]hat Silva was expected to say was more than tangentially probative on the central issue of the truthfulness of the complainant." *Id.* at 237. The alleged statement by Sara did not have such a bearing on the truthfulness of her complaints against the defendant. Cf. *Commonwealth* v. *Sherry*, 386 Mass. 682, 693 (1982).          .

Again, the defendant argues that Carrie's proposed testimony would amount to a prior inconsistent statement, a contradiction of the Commonwealth's "representation," made through the medical evidence, that Sara had not had sex with anyone but the defendant. But we have yet to see a case where testimony by A (Carrie) of a prior statement by B (Sara) is admitted to contradict a statement by C (physician) — let alone a "representation" by C — thereby impeaching C — and inferentially B. Cf. *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 405 (1982); *Commonwealth* v. *Beauregard*, 25 Mass. App. Ct. 983, 984 (1988).

Still further, the defendant says he is entitled to "rebut" by means of Carrie's testimony the Commonwealth's theory of the medical evidence as bearing on the defendant's guilt. For this curious suggestion the defendant cites *Commonwealth* v. *Reynolds*, 338 Mass. 130, 133 (1958), and *Commonwealth* v. *Brookins*, 416 Mass. 97, 103 (1993), which do not fit the proposition and are quite conventional.

The defendant argues that the exclusion of Carrie's testimony infringed his constitutional right to present a full defense, but there was no violation if the exclusion conformed to the rules of evidence as generally understood and applied. See *Commonwealth* v. *Bohannon*, 385 Mass. 733, 750-751

(1982); *Commonwealth* v. *Weaver*, 395 Mass. 307, 310-311 (1985).

On this appeal the defendant does not renew his objection to the prosecutor's closing remarks on the ground that the evidence did not support a connection of the defendant to Sara's disease; rather he points to these remarks as reflecting prejudice resulting from the denial of recall and exclusion of Carrie's testimony. In the condition of the evidence (the ruling having been correct, as we think), the prosecutor could ask the jury to make the inference if they chose. He might have been less thespian in doing so.

*Judgments affirmed.*