COMMONWEALTH *vs.* MICHAEL McAFEE.

Suffolk. October 6, 1999. - December 28, 1999.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, & IRELAND, JJ.

*Practice, Criminal,* Severance, Judicial discretion, Required finding, Capital case. *Constitutional Law,* Confrontation of witnesses, Fair trial. *Evidence,* Impeachment of credibility, Prior inconsistent statement, Relevancy and materiality, Photograph, Identification, Self-defense. *Identification. Due Process of Law,* Identification. *Homicide. Self-Defense.*

At the trial of two defendants on indictments for murder in the first degree, the judge did not abuse his discretion in denying one defendant's motions for a severance, where the defenses offered were not in conflict [485-486], and where, in any event, no prejudice to either defendant resulted [486-487].

At the trial of two defendants for murder in the first degree, the statement of the nontestifying defendant was properly admitted in evidence with instructions to the jury that the statement could be used only against the speaker, where the statement did not sufficiently inculpate the other defendant so as to violate his confrontation rights and warrant severance of the defendants' cases. [487-489]

At the trial of a criminal case, the judge correctly excluded proffered testimony of a defense witness which was not relevant to any issue, where the sole reason to call the witness would have been to impeach her with otherwise inadmissible prior inconsistent statements: the proposed testimony was not probative of the defendant's guilt or innocence, and its exclusion did not violate any right of the defendant or cause any prejudice. [489-492]

The record of a criminal trial did not support a contention that the jury heard the judge make certain allegedly disparaging remarks about a particular witness. [492-493]

At the trial of a murder case, there was no error in the judge's admission in evidence of a testifying witness's photographic identification of the defendant, and there was no error in the admission in evidence of sanitized copies of the mugshots the witness had selected. [493-494]

At the trial of an indictment for premeditated murder, the evidence was sufficient to support the jury's verdict of guilty, without mitigation by asserted self-defense or reasonable provocation. [494-496]

INDICTMENTS found and returned in the Superior Court Department on August 8, 1995.

The cases were tried before *Robert W. Banks*, J.

*Daniel J. O'Connell, III*, for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. After being tried in the Superior Court jointly with his codefendant, Ronny Elliot, see *Commonwealth* v. *Elliot*, *post* 498 (1999), the defendant, Michael McAfee, was found guilty of murder in the first degree on theories of both deliberate premeditation and extreme atrocity or cruelty, armed assault with intent to murder, and illegal possession of a rifle. On appeal, he claims numerous errors warranting reversal of his convictions and an order for a new trial. Alternatively, he requests that we exercise our authority pursuant to G. L. c. 278, § 33E, to reduce the homicide verdict to manslaughter or murder in the second degree. We affirm the convictions and decline his request to reduce the verdict.

1. *Facts.* We recite the facts as the jury could have found them, reserving certain facts for discussion in connection with specific issues raised on appeal. On July 10, 1995, the defendant and Ronny Elliot, along with three companions, were involved in a fight at a McDonald's restaurant in the Roxbury section of Boston with another young man, Steve Clinton, nicknamed "Country." Clinton was punched and kicked by the codefendants and their companions before he managed to run into the restaurant. Alvaro Sanders, whom Clinton approached for assistance, intervened and suggested that the defendant fight Clinton one-on-one. The defendant laughed and swore at Sanders, and two of his companions approached Sanders in a threatening manner, but backed off when Sanders warned them that he, unlike Clinton, would fight back. Sanders was angry, feeling that he had been "disrespected" by the defendant, but, because he was outnumbered, left the scene in his automobile. He then sought the assistance of the victim to retaliate against the defendant and Elliot.

Approximately two hours later, Sanders and the victim located the codefendants on Walnut Avenue in Roxbury. After a brief chase — Sanders in his automobile, the codefendants on bicycles — Sanders drove the wrong way down Catawba Street, stopping in front of Elliot's house, to where the codefendants had fled. Sanders and the victim got out of the automobile. As Elliot ran inside his house, the defendant ran down an alley adjacent to the house. Moments later, Elliot emerged from the house carrying a rifle, stood on the porch, and then joined the

defendant, who had reappeared from the alley, on the sidewalk behind an automobile. The victim was standing in the middle of the street, directly in front of the codefendants, at a distance of about ten to fifteen feet; Sanders was standing approximately ten feet to the victim's right. As Elliot raised the rifle and alternated pointing it at the victim and Sanders, the defendant, who was standing two or three feet from Elliot, twice yelled at Elliot, "Lace them niggers." When Elliot did not fire, the defendant took the rifle from him in a "pass and grab" motion, cocked it, pointed it at the victim and said, "Fuck this. I'm about to lace these niggers." The victim raised his hands in the air, telling the defendant, "Come downstairs and fight us up and up," meaning that the defendant should put down the rifle and fight him with fists. The defendant then shot the victim six times, once in the back, and fired once at Sanders as he ran from the scene, missing him. Someone standing near the defendant then threw a bottle at the victim, which shattered on the ground near his feet. The victim collapsed at the scene; he was later transported by emergency medical personnel to Boston City Hospital, where he was pronounced dead. The defendant, still carrying the rifle, ran down Catawba Street. Four days later, Boston police recovered a rifle in a narrow space between fences at a nearby address on Catawba Street, and ballistics tests confirmed that it matched all the shell casings found at the scene and one of the bullets that had lodged in the victim's chest; the other bullets that had struck the victim were too damaged to be linked conclusively to the rifle.

Sanders immediately reported the shooting to Boston police. He told the police that night that the shooter's first name was "Mike," but that he did not know his last name, and the next day he selected the defendant's and Elliot's photographs from photographic arrays. The defendant was arrested two days after the shooting, and Elliot eight weeks later.

2. *Denials of motions for severance.*

a. *Mutually antagonistic defenses.* The defendant argues, citing *Commonwealth* v. *Moran*, 387 Mass. 644, 659 (1982), that the judge's denial of his motions to sever his trial from Elliot's was prejudicial error because their defense theories were in irreconcilable conflict. We disagree.

Absent a constitutional requirement for severance, joinder and severance are matters committed to the sound discretion of the trial judge. See *Commonwealth* v. *Vieira*, 401 Mass. 828,

836-837 (1988); *Commonwealth* v. *Moran, supra* at 658. A judge's refusal to allow a timely motion for severance constitutes an abuse of discretion when "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Id.* In order for such compelling prejudice to arise, it is not enough that the defendants are hostile to one another or that one defendant would have a better chance of acquittal if tried alone. See *Commonwealth* v. *Moran, supra* at 659. Rather, severance is mandated only if their defenses conflict to the point of being mutually antagonistic and irreconcilable. See *id.*

Here, the judge did not abuse his discretion in denying the defendant's multiple motions for severance, as the defenses offered by the two codefendants were not in conflict, let alone irreconcilable. The defendant argued that he was misidentified as the shooter by the Commonwealth's key eyewitness, Alvaro Sanders. Elliot denied being a joint venturer in the murder, claiming that his companion, whom he did not identify as the defendant, was the actual shooter; he argued, alternatively, that the shooting was in self-defense. Elliot's defense thus did not contradict the defendant's claim that he was not Elliot's companion at the crime scene and that he was the subject of wilful misidentification by a biased prosecution witness. See, e.g., *Commonwealth* v. *Clarke*, 418 Mass. 207, 217 (1994) (defenses not mutually antagonistic where one defendant claimed he was present at crime scene but not a participant, and the other defendant claimed that prosecution witnesses were not credible); *Commonwealth* v. *Craig C.*, 44 Mass. App. Ct. 209, 216 (1998) (severance not warranted where defendant claimed he was merely bystander at crime scene and codefendant claimed that eyewitness had misidentified him as shooter). Moreover, both defendants vigorously attacked the credibility of eyewitness Sanders, thereby indicating that they "shared a common approach to raising a reasonable doubt" about their guilt in the jury's minds. *Commonwealth* v. *Smith*, 418 Mass. 120, 126 (1994), quoting *Commonwealth* v. *Mahoney*, 406 Mass. 843, 849 (1990). In short, this was not a case where each defendant was pitted against the other or sought to escape conviction by blaming his codefendant.[1] See *Commonwealth* v. *Moran, supra.*

Finally, even if the defendant's and the codefendant's

---

[1] To support his claim that Elliot's strategy was to point the finger at him, the defendant cites remarks made by Elliot's trial counsel in closing argument,

defenses could be construed as mutually antagonistic, the judge's refusal to grant severance in the circumstances did not result in substantial prejudice to either defendant. Unlike *Commonwealth* v. *Moran, supra* at 654, 660, where the prosecution had no eyewitnesses to the crime who could testify to the presence and participation of both defendants and therefore had to rely on each inculpating the other, here the Commonwealth had an eyewitness who testified that both defendants participated in the shooting. Accordingly, the jury had the option to disbelieve both defendants' proffered defenses and to credit the testimony of the eyewitness instead. In such circumstances, we have held that any prejudice that might have resulted from a failure to sever was not sufficiently compelling to warrant appellate relief. See *Commonwealth* v. *Gordon,* 422 Mass. 816, 825-826 (1996); *Commonwealth* v. *Cordeiro,* 401 Mass. 843, 853 (1988); *Commonwealth* v. *Sinnott,* 399 Mass. 863, 874-875 (1987).

b. *The* Bruton *issue.* The judge admitted a statement that Elliot made to police after the murder, in which he denied participating in, or even witnessing, the shooting; denied any prior acquaintance with the defendant; and confirmed his previous identification of the defendant from a photograph shown to him by police. At the defendant's request, the judge twice instructed the jury that they could consider the statement only against Elliot and not against the defendant. The defendant argues, citing *Bruton* v. *United States,* 391 U.S. 123 (1968), that severance was constitutionally required because admission in evidence of this extrajudicial statement, when Elliot did not

where she first summarized Sanders's testimony that, just prior to the shooting, "[The defendant] shouts a command to Ronny [Elliot], 'lace them . . .' he shouted it twice, 'lace them . . .' " and then stated that "the shooter" took the rifle and shot the victim. The defendant acknowledges that Elliot's counsel avoided naming the defendant as the shooter, but argues that these remarks nonetheless made clear to the jury that Elliot was blaming the shooting on him. We have held, however, that such remarks in a closing argument will not support a claim for severance where counsel for a defendant accurately summarizes the Commonwealth's evidence against the defendant and does not undermine that defendant's theory of defense. See *Commonwealth* v. *Hamilton,* 426 Mass. 67, 74 (1997). Inasmuch as Elliot's counsel took care not to name the defendant as "the shooter," her remarks were entirely consistent with the defendant's theory that the Commonwealth's eyewitness had wilfully misidentified him as the shooter. We note, additionally, that on one other occasion where Elliot's counsel uttered the defendant's name in connection with the shooting, she was cross-examining Sanders and repeating his testimony as a prelude to a question, but corrected herself immediately, referring instead to "the shooter."

testify at trial and was thus unavailable for cross-examination, violated his constitutional right to confront adverse witnesses. Although Elliot's statement did not expressly inculpate the defendant in the murder, the defendant argues that, because the truth of this statement was effectively impeached by the Commonwealth, the jury might have inferred that the defendant's theory of misidentification was likewise not credible, thereby making Elliot's statement inculpatory of the defendant in the context of other evidence adduced at trial. In these circumstances, defendant alleges, the judge's refusal to grant severance was prejudicial error. We reject this argument.

"Where a nontestifying codefendant's statement ' "expressly implicate[s]" the defendant, leaving no doubt that it would prove to be "powerfully incriminating," ' the confrontation clause of the Sixth Amendment [to the United States Constitution] has been offended," notwithstanding any limiting instruction by the judge that the jury may consider the statement only against the codefendant. *Commonwealth* v. *Blake*, 428 Mass. 57, 60 (1998), quoting *Commonwealth* v. *James*, 424 Mass. 770, 782 (1997). However, when a codefendant's statement becomes inculpatory of a defendant only when linked with other evidence adduced at trial, generally a limiting instruction is sufficient to cure a violation of the defendant's confrontation rights. See *Commonwealth* v. *Blake, supra.* See also *Richardson* v. *Marsh*, 481 U.S. 200, 208-209 (1987), modifying *Bruton* v. *United States, supra.* A judge's limiting instruction may at some point prove ineffective to obviate confrontation clause concerns, but this point is reached "only where the circumstances of the case and the nature of the codefendant's statement so obviously implicate the defendant in the crime itself as virtually to constitute direct incrimination." *Commonwealth* v. *Blake, supra,* quoting *Commonwealth* v. *James, supra* at 783. See *Gray* v. *Maryland*, 523 U.S. 185, 196-197 (1998). See also *Commonwealth* v. *Keevan*, 400 Mass. 557, 570 (1987).

Elliot's statement, when taken together with other evidence at trial, did not sufficiently inculpate the defendant so as to constitute the sort of contextual incrimination that mandates severance. Elliot did not identify the defendant as the shooter and did not claim to have seen him either at the crime scene or running away with a rifle. Although Elliot did confirm his prior identification of the defendant's photograph, his statement clearly indicated that the basis for this identification was his

having seen the defendant in a restaurant some time prior to the shooting. Elliot's statement was thus entirely consistent with the defendant's defense that he was not present at the shooting and had been misidentified as the shooter. As to the defendant's attenuated argument that the evident falsity of Elliot's statement impaired the credibility of his own defense in the jury's minds, we have held that such circumstances do not amount to contextual incrimination that would negate the effectiveness of a limiting instruction. See *Commonwealth* v. *James, supra* at 781-782, 783-784 (no contextual incrimination where codefendant's out-of-court statement allegedly " 'pulled [defendant] into' . . . demonstrably false alibi"). Because the judge effectively instructed the jury that they were not to consider Elliot's statement against the defendant, there was no violation of the defendant's right to confrontation, see *Commonwealth* v. *Blake, supra* at 60; *Commonwealth* v. *Keevan, supra* at 557, and therefore no requirement of severance.

3. *Exclusion of testimony.* At trial, Elliot attempted to call a witness, Alasandrea Pomales, who, he claimed, had told his trial counsel and private investigator shortly after the murder that she had seen Alvaro Sanders holding a handgun and the victim holding a beer bottle at the scene of the shooting. These statements cast doubt on the credibility of Sanders, the Commonwealth's key eyewitness, and also supported Elliot's theory of self-defense. On voir dire Pomales denied having spoken with defense counsel or having made the statements attributed to her, and claimed that she had not witnessed the shooting. The judge excluded Pomales's testimony, stating that it was not probative of either defendant's guilt and that he would not allow Elliot to call Pomales solely to impeach her with her prior inconsistent statements and thereby put inadmissible evidence before the jury, and noted an objection by Elliot's counsel. The defendant argues for the first time on appeal that the judge's exclusion of Pomales's testimony was prejudicial error as to him, because it deprived him of probative exculpatory evidence. We disagree.

By statute, a party may impeach his own witness with prior inconsistent statements, provided that a proper foundation is laid. G. L. c. 233, § 23. The Appeals Court has held, however, that a party cannot rely on this statutory right to call a witness whom he knows beforehand will offer no testimony relevant to an issue at trial solely for the purpose of impeaching that wit-

ness with prior inconsistent statements that would otherwise be inadmissible. See *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 114-115 (1992). See also *Commonwealth* v. *McGee*, 42 Mass. App. Ct. 740, 746 (1997). This rule, recommended by the sound policy of not permitting a litigant to evade the principle of hearsay exclusion and to introduce evidence which would be improper for the jury to consider for its substantive value, is well-recognized in the Federal courts. See cases cited in *Commonwealth* v. *McGee, supra*; *Commonwealth* v. *Benoit, supra* at 115-116. Although we have not previously spoken to this precise issue,[2] our decision in *Brooks* v. *Weeks*, 121 Mass. 433, 434 (1877), interpreting an earlier version of G. L. c. 233, § 23, suggested that a witness's testimony would properly be excluded from trial if the witness "was introduced merely for the purpose of contradicting him." Moreover, the *Benoit* restriction comports with our long-established rule that, for a party to avail himself of his right under G. L. c. 233, § 23, to impeach his own witness by prior inconsistent statements, the testimony which he seeks to contradict must first be deemed relevant to issues on trial. See *Commonwealth* v. *Connolly*, 308 Mass. 481, 484 (1941); *Klein* v. *Keresey*, 307 Mass. 51, 53 (1940); *Kavanaugh* v. *Columbo*, 304 Mass. 379, 381 (1939); *Commonwealth* v. *Doyle*, 5 Mass. App. Ct. 544, 550 (1977). Cf. *Commonwealth* v. *Gagnon*, 408 Mass. 185, 198 (1990) ("a trial judge has no discretion to permit a witness to appear before a jury for the sole purpose of properly invoking his or her privilege against self-incrimination," because this would produce no relevant evidence and invite the jury to engage in improper speculation).

In light of these principles, the judge did not err in refusing to allow Pomales to testify. From Pomales's voir dire testimony, it was apparent to the judge and to Elliot's trial counsel that, if she were called, she would testify that she had not seen Sanders at the crime scene with a handgun or witnessed the shooting, having arrived on Catawba Street only afterward, and that she would deny having made any statements to the contrary to Elliot's counsel and investigator. See, e.g., *Commonwealth* v. *McGee, supra* at 745-746 (*Benoit* rule applies where, on basis of witness's voir dire, it can be anticipated that witness whom

---

[2]In *Cramer* v. *Commonwealth*, 419 Mass. 106, 111-112 n.3 (1994), we acknowledged *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 116-117 (1992), but held it distinguishable from the facts before us.

party seeks to impeach will not offer relevant testimony). Her proposed testimony was thus not probative of either codefendant's guilt on the crimes charged, and its exclusion therefore did not offend either Elliot's or the defendant's right to impeachment under G. L. c. 233, § 23. See *Commonwealth* v. *Connolly, supra*; *Commonwealth* v. *Benoit, supra* at 114-115; *Commonwealth* v. *McGee, supra.*[3]

The defendant argues, however, that had Elliot been permitted to call Pomales, impeaching her by means of her prior inconsistent statements would have elicited probative evidence on the issue of his guilt, because prior inconsistent statements admitted for impeachment purposes may be considered as substantive evidence by the jury provided that the opposing party does not object or request a limiting instruction. See, e.g., *Commonwealth* v. *Luce*, 399 Mass. 479, 482 (1987), and authorities cited. However, even were we to assume on the basis of this speculation that the defendant should have been afforded the opportunity to call and to impeach Pomales, we would nevertheless conclude that the defendant was not prejudiced by the lack of Pomales's testimony.[4] The defendant surmises that his attempted impeachment of Pomales would have gone unopposed by the Commonwealth. However, the rec-

---

[3]We also reject the defendant's claim that the exclusion of Pomales's testimony abridged his constitutional right to present witnesses in his own behalf. Evidentiary rules of exclusion "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *United States* v. *Scheffer*, 523 U.S. 303, 308 (1998), quoting *Rock* v. *Arkansas*, 483 U.S. 44, 56 (1987). The rule in *Benoit* limiting the right to impeachment under G. L. c. 233, § 23, goes no farther than needed to ensure that only relevant and reliable evidence reaches the jury and to avoid litigation on collateral issues. See *United States* v. *Scheffer, supra*. Moreover, we have previously held that this constitutional right is not offended by the exclusion of a witness who has "no personal knowledge related to the issues before the jury." *Commonwealth* v. *Vitello*, 367 Mass. 224, 235 (1975). Finally, as to the defendant's suggestion that Pomales's extrajudicial statements "bore the earmarks of reliability" because memorialized in defense counsel's contemporaneous notes, such circumstantial indicia of reliability are not relevant to determining the admissibility of these alleged statements, as we do not recognize the innominate exception to the hearsay rule embodied in Fed. R. Evid. 804(b)(5) and 803(24) (1997). See *Commonwealth* v. *Semedo*, 422 Mass. 716, 728 (1996).

[4]Because the defendant did not object at trial to the judge's exclusion of Pomales's testimony, our review is limited to inquiring whether this ruling was error that created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992).

ord demonstrates that this hypothesis is extremely unlikely.[5] Had Pomales been called and impeached, then, the defendant would not have benefited from the exculpatory substance of her alleged prior statements, because those statements would have been limited to their impeachment value. See *Commonwealth* v. *Luce, supra* at 482; *Commonwealth* v. *Daye,* 393 Mass. 55, 66 (1984). We therefore conclude that the judge's failure to admit Pomales's testimony could not have created a substantial likelihood of a miscarriage of justice.[6] See *Commonwealth* v. *Allen, ante* 252, 255 (1999), citing *Commonwealth* v. *Ruddock,* 428 Mass. 288, 292 n.3 (1998).

4. *Prejudicial treatment of the codefendant's witness.* The defendant maintains that certain remarks that the judge made about Pomales at sidebar with the jury present — in which, he alleges, the judge threatened to cite Pomales for perjury — violated his Federal and State constitutional rights to a fair trial, because Pomales's credibility was disparaged before the jury, which prejudiced the efforts of the defendant to argue self-defense. This argument lacks merit.

---

[5]When the judge agreed to issue a capias for Pomales's arrest to compel her appearance in court, the prosecutor alerted the judge that he intended to oppose her testimony, stating that it raised "a *Benoit*-type issue." On her subsequent appearance, the prosecutor requested a voir dire, arguing, "There is no value to her testimony whatsoever," and that Elliot was calling her solely for the purpose of impeaching her with her prior inconsistent statements, in violation of the *Benoit* rule.

[6]The defendant claims that the discrepancy between Pomales's alleged prior statements and her testimony on voir dire is attributable to intimidation by Boston police officers and her father, supposedly a police officer also. At trial, Elliot's counsel represented to the judge that Pomales first appeared in response to a summons on the scheduled trial date but, when the proceedings were delayed, she was "interviewed at great length" by Boston police, after which she "ran scared." Pomales herself testified on voir dire that she spoke with the police on that date and told them that she had been in front of her house on Charlame Street, around the corner from Catawba Street, on the day of the shooting. Robert Selevitch, Elliot's investigator, testified that, when he tried to locate Pomales in preparation for trial, her father threatened him and told him that she "didn't see anything and was not going to testify." Elliot's counsel's handwritten notes of her interview with Pomales, containing references to Pomales's alleged exculpatory statements, were submitted and received as a voir dire exhibit. The attorney did not testify. Because the attorney could not be a witness, see Mass. R. Prof. C. 3.7, 426 Mass. 1396 (1998); Rule 12 of the Rules of the Superior Court (1999), this matter more properly may be raised by a motion for a new trial. Any additional evidence that may exist could also properly be raised by a motion for a new trial. See Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979).

The record does not support the premise that the jury heard the remarks or that those remarks concerned Pomales. More importantly, the credibility of a witness who was properly not permitted to testify could not have affected the outcome of the case.

5. *Admission of photographic identification.* The judge, over both defendants' objections, allowed the Commonwealth to introduce evidence of Alvaro Sanders's pretrial identification of the defendant and Elliot from police photographic arrays, as well as sanitized copies of the mugshots which Sanders had selected. There was no error.

Where a testifying witness in a criminal case identifies the defendant at trial, evidence that the witness made a prior extra-judicial identification of the defendant is admissible both to corroborate the in-court identification and as substantive evidence of the defendant's guilt. See *Commonwealth* v. *Daye, supra* at 60-62; *Commonwealth* v. *Weichell,* 390 Mass. 62, 70-72 (1983), cert. denied, 465 U.S. 1032 (1984). When the identifying witness acknowledges the prior identification and is available to be cross-examined, admission of the prior consistent identification for probative purposes does not offend the defendant's due process rights. See *Commonwealth* v. *Warren,* 403 Mass. 137, 141 (1988). Clearly, the fairness of the defendant's trial was not impaired by the judge's admission in evidence of Sanders's identification of the defendant from a photographic array the day after the shooting.

Nor was there error in admitting the photographs themselves in evidence. Mugshots may be admitted in evidence if the prosecution shows some need for their introduction, they are offered in a form that does not imply a prior criminal record, and the manner of their introduction does not call attention to their source. See *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 309 (1979), citing *United States* v. *Fosher,* 568 F.2d 207 (1st Cir. 1978); *Commonwealth* v. *Picher,* 46 Mass. App. Ct. 409, 416 (1999). As to the Commonwealth's need, the photograph was relevant to explain "how the accusing finger came to be pointed at the defendant." *Id.,* quoting *Commonwealth* v. *Smith,* 29 Mass. App. Ct. 449, 451-452 (1990). Additionally, although the defendant argued in closing argument that Sanders deliberately misidentified him as the shooter out of bias, he also suggested that Sanders might not have been able to see the shooter well enough to make a reliable identification. Introduction of the

photograph which Sanders had selected from an array the day after the shooting countered this argument and "assist[ed] the jury in evaluating the accuracy of the photographic identification." *Commonwealth* v. *Picher*, *supra*, quoting *Commonwealth* v. *Smith*, *supra* at 451. See *Commonwealth* v. *Francis*, 391 Mass 369, 375 (1984); *Commonwealth* v. *Gee*, 36 Mass. App. Ct. 154, 158 (1994) ("[w]here the sole issue at trial was the identification of the defendant, there can be little doubt as to the Commonwealth's need to use the photographs"). Finally, the photographs were admitted in a properly sanitized form, and the judge clearly instructed the jury that there were many reasons for the police to have had the defendants' photographs in their possession and that no adverse inference was therefore to be drawn regarding the defendants' criminal past. See *Commonwealth* v. *Rodriguez*, *supra*. All required steps were thus taken to ensure adequate protection of the defendant's due process rights.[7]

6. *Sufficiency of the evidence.* The defendant argues that his motion for a required finding of not guilty on the charge of murder in the first degree should have been allowed because the evidence was insufficient to prove beyond a reasonable doubt that the defendant acted with deliberate premeditation or to disprove that he acted in self-defense or on reasonable provocation. We conclude that there was sufficient evidence to support the jury's verdict.

In reviewing a denial of a motion for required finding of not guilty, we inquire whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to satisfy any rational trier of fact that the essential elements of the crime had been proven beyond a reasonable doubt. See *Commonwealth* v. *Coonan*, 428 Mass. 823, 828 (1999); *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). The jury could reasonably have inferred from the evidence that the defendant acted with deliberate premeditation, having "resolved to kill after a period

[7]The cases cited by the defendant on this issue are inapposite. In *Commonwealth* v. *Smith*, 21 Mass. App. Ct. 619, 622-623 (1986), *S.C.*, 400 Mass. 1002 (1987), the admission of a sanitized mugshot of the defendant was held to be prejudicial error where police had arrested the defendant at the scene of the crime, the defendant did not challenge his identification as the alleged guilty person, and the photograph therefore had no probative value. And in *Commonwealth* v. *Thayer*, 39 Mass. App. Ct. 396, 397-399 (1995), the mugshots, held to have been improperly admitted, had been inadequately sanitized before being published to the jury.

of reflection." *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994). See *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905). There was evidence that the defendant twice urged Elliot to fire the rifle at the victim and Sanders, shouting "[l]ace them." When Elliot did not shoot, the defendant voluntarily took the rifle from him in a "pass and grab" motion, cocked it, pointed it at the victim, who was standing ten to fifteen feet away with his hands in the air, stated his intent to shoot him, and then shot him six times, with one shot hitting him in the back. See *Commonwealth* v. *Andrews*, 427 Mass. 434, 440 (1998) (firing four shots at unarmed victim at close range was more than sufficient to warrant finding of deliberately premeditated murder); *Commonwealth* v. *Williams*, 422 Mass. 111, 122-123 (1996) (firing three shots supports reasonable inference of premeditated murder); *Commonwealth* v. *Good*, 409 Mass. 612, 618 (1991) (where defendant, armed with handgun, shot victim three times at close range, rational trier of fact could have found that "the defendant at least briefly reflected on his resolution to kill the victim"). That all of this transpired suddenly, within a few moments, does not preclude drawing an inference of deliberate premeditation. See *Commonwealth* v. *Chipman*, *supra* at 269, and cases cited ("[n]o particular period of reflection is required for deliberate premeditation to be found"; "a plan to murder may be formed within a few seconds"). Accord *Commonwealth* v. *Tucker*, *supra*.[8]

Finally, we find no merit to the defendant's contention that the evidence supported at most a verdict of voluntary manslaughter because the Commonwealth failed to disprove beyond a reasonable doubt that he acted in self-defense or in the heat of passion on sudden provocation. Even if we assume[9] that the evidence, when viewed in the light most favorable to the

---

[8]We note, additionally, that the jury also found the defendant guilty of murder in the first degree by reason of extreme atrocity or cruelty. Although the defendant does not argue that the evidence was insufficient to support this finding, we note, nevertheless, that it was rationally supported by the Commonwealth's evidence, in light of the factors we delineated in *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

[9]The judge instructed the jury that, if evidence of self-defense or provocation had been presented at trial, then the Commonwealth assumed the burden of disproving justification and mitigation beyond a reasonable doubt in order to prove murder. As to self-defense, the defendant himself appears to concede that the evidence was insufficient to raise this issue for the jury. At least, we take this to be the meaning of the rather cryptic statement in his brief that,

defendant, was sufficient to raise self-defense and provocation as issues for trial, thereby putting the Commonwealth under a burden of disproving them beyond a reasonable doubt, see *Commonwealth* v. *Reed*, 427 Mass. 100, 102-103 (1998); *Commonwealth* v. *Fluker*, 377 Mass. 123, 127, 130-131 (1979), we conclude that the evidence, when viewed in the light most favorable to the Commonwealth, was sufficient to persuade a rational trier of fact that this burden was met. As to self-defense, the jury could have found that the victim was unarmed, with his hands in the air, and that the defendant, having first fled down an alley adjacent to Elliot's house, returned to the front of the house once Elliot came out with a rifle. A rational jury could thus infer that the defendant had no reasonable basis to believe that he was in imminent danger of suffering death or serious bodily harm from the victim and that he had not "availed all proper means to avoid physical combat." *Commonwealth* v. *Niemic*, 427 Mass. 718, 722 (1998), quoting *Commonwealth* v. *Kendrick*, 351 Mass. 203, 212 (1966). As to reasonable provocation, the jury could have found that, although the victim and Sanders chased the defendants to Elliot's house, they were unarmed at the scene of the shooting, challenged the defendants at most to a fist fight, and never actually hit or attempted to hit the defendants. This evidence, if believed, was sufficient to overcome any reasonable doubt that the defendant confronted circumstances "likely to produce in an ordinary person such a state of passion, anger, fear, fright or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Curtis*, 417 Mass. 619, 629 (1994), quoting *Commonwealth* v. *Walden*, 380 Mass. 724, 728 (1980). See *Commonwealth* v. *Masello*, 428 Mass. 446, 449-450 (1998), and cases cited; *Commonwealth* v. *McLeod*, 394 Mass. 727, 738-739, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985).

7. *Cumulative error.* Because we find no merit to each of the defendant's previous assignments of error, we reject his claim that their cumulative effect was prejudicial and warrants a new trial.

8. *Relief under G. L. c. 278, § 33E.* After reviewing the entire record, we are satisfied that the jury's verdict of murder in the

"there was surely not the quotient of self-defense evidence at trial that [the defendant] asserts there ought to have been."

first degree was consistent with the law and the weight of the evidence and consonant with justice, and we therefore see no reason to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree or manslaughter.

*Judgments affirmed.*