## Commonwealth *vs.* Nathan Rivera
### (and eleven companion cases[1]).

Suffolk. September 7, 2012. - January 9, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Homicide. Joint Enterprise. Constitutional Law,* Admissions and confessions, Assistance of counsel, Confrontation of witnesses. *Practice, Criminal,* Admissions and confessions, Assistance of counsel, Confrontation of witnesses, Severance, Redaction, Instructions to jury, Argument by prosecutor, Jury and jurors, Duplicative convictions, Capital case. *Evidence,* Hearsay, Verbal completeness, Joint venturer, Expert opinion, Photograph. *Jury and Jurors. Felony-Murder Rule.*

Discussion of the police duty under art. 12 of the Massachusetts Declaration of Rights immediately to inform a criminal suspect of his attorney's efforts to contact him and to relay the attorney's advice that the suspect should not talk to police. [64-67]

This court declined to extend the requirement that police, in informing a criminal suspect of his attorney's efforts to contact him, also relay the attorney's advice that the suspect should not talk to police to a situation in which the attorney merely instructed the police not to talk to his client; therefore, there was no error in a Superior Court judge's denial of a criminal defendant's pretrial motion to suppress statements he gave to police. [67]

At a joint murder trial of codefendants, the judge did not abuse his discretion either in the admission of a redacted statement given to police by one non-testifying codefendant that inferentially incriminated the other codefendant or in the denial of the other codefendant's motions to sever the trials, where the judge gave adequate limiting instructions on multiple occasions, in that the redacted statement incriminated the other codefendant only to the extent that the jury accepted the other evidence against him that placed him at the scene [68-71]; further, the judge did not abuse his discretion in denying the motion to sever of the codefendant who gave the statement to police, where the defenses offered by the two codefendants (i.e., the other codefendant presented an alibi defense, and the codefendant who gave the statement claimed withdrawal from any joint venture before the murders took place) were not in conflict, let alone irreconcilable, notwithstanding the admission of the redacted statement [71-73].

This court declined to address the merits of a murder defendant's argument concerning the judge's instruction on withdrawal from a joint venture, where the evidence at trial was insufficient to warrant such an instruction,

---

[1]Six indictments against Terrence Brown and five against Nathan Rivera.

in that there was no evidence to suggest that the defendant communicated to his coventurer any intent to withdraw, and in any event, even if the defendant's act of leaving the apartment prior to the shootings could have communicated such an intent, the withdrawal would have been untimely. [73-76]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the erroneous admission of testimony by a substitute medical examiner concerning the autopsy findings of the medical examiner who performed the autopsy, in violation of the defendant's confrontation rights under the Sixth Amendment to the United States Constitution, where there was no dispute as to the cause of death of the victims; where there was ample other evidence of extreme atrocity or cruelty; where the only pertinent piece of the expert's testimony that was not cumulative of other evidence, i.e., his opinion based on the underlying findings concerning the victims' gunshot wounds, was properly admissible; and where the autopsy photographs, which were admitted without proper authentication, were of limited probative value. [76-79]

At a murder trial, no substantial risk of a miscarriage of justice arose from the prosecutor's improper remark in closing argument that stated facts not in evidence; further, the prosecutor's suggestion in closing argument that the jury should contrast each of the codefendants' statements to determine which of the two was being truthful was not improper. [79-80]

The judge at a murder trial did not abuse his discretion in denying a motion for an evidentiary hearing concerning a juror's postverdict inquiry of the prosecutor, where there was nothing in the juror's inquiry to suggest any extraneous influence on the jury's deliberations. [80-81]

In the circumstances of a criminal trial at which the defendant was convicted of murder in the first degree on, inter alia, a theory of felony-murder, and at which the jury identified two predicate felonies, i.e., home invasion, a crime with which the defendant was charged, and attempted armed robbery, an uncharged crime, there was no risk of a duplicative conviction or sentence on the uncharged crime, in that there was no underlying conviction; therefore, with the uncharged attempted robbery serving as the predicate felony, the defendant's conviction on the home invasion charge could stand. [81-82]

INDICTMENTS found and returned in the Superior Court Department on September 26, 2001.

A pretrial motion to suppress evidence was heard by *Janet L. Sanders*, J.; a pretrial motion for relief from prejudicial joinder was heard by *Margaret R. Hinkle*, J.; a renewed motion for relief from prejudicial joinder was heard by *Charles T. Spurlock*, J.; a motion for relief from prejudicial joinder also was heard by him; the cases were tried before him; and a motion for a postverdict evidentiary hearing, filed on October 13, 2006, also was heard by him.

*Stephen Paul Maidman* for Nathan Rivera.

*Charles K. Stephenson* for Terrence Brown.

*Teresa K. Anderson,* Assistant District Attorney, for the Commonwealth.

CORDY, J. On the morning of August 10, 2001, two armed and masked assailants entered the apartment of Karen Young, Wei Li, and Roland Chow at 40 Parker Hill Avenue in the Mission Hill neighborhood of Boston. One assailant bound the occupants' wrists and ankles with duct tape, and one or both of them searched the apartment for drugs and money. One of the assailants then shot Young six times in the head and Chow once in the head, killing them both. He also attempted to shoot Li but apparently ran out of ammunition. Terrence Brown was linked to the scene by fingerprint evidence. He and Nathan Rivera were each indicted on two charges of murder in the first degree; armed assault with intent to murder; three charges of armed assault in a dwelling; armed robbery; three charges of home invasion; and unlawful possession of a firearm. Following a joint trial, a jury found each defendant guilty of murder in the first degree, based on multiple and differing theories;[2] two charges of armed assault in a dwelling; home invasion;[3] and unlawful possession of a firearm. Rivera was also found guilty of armed assault with intent to murder. Both defendants were acquitted of armed robbery.

The defendants raise numerous claims of error on appeal. Principally, Brown claims that his statement to police, admitting his involvement in the home invasion, was obtained in violation of art. 12 of the Massachusetts Declaration of Rights and *Commonwealth* v. *Mavredakis,* 430 Mass. 848 (2000), and that the redacted version of his statement that was introduced at trial violated his constitutional right to present his defense of

[2]The jury found Rivera guilty of murder in the first degree of Chow based on deliberate premeditation and felony-murder, and of Young based on deliberate premeditation, extreme atrocity or cruelty, and felony-murder. The jury convicted Brown of murder in the first degree of both Chow and Young based on felony-murder. The jury found two underlying felonies for each felony-murder conviction — home invasion and attempted armed robbery.

[3]Rivera's conviction of home invasion was placed on file with his consent and is not part of the appeal. The trial judge ordered Brown's home invasion conviction placed on file but he objected. Because a defendant must consent to the filing of a conviction, that conviction is before us on appeal. See *Commonwealth* v. *Delgado,* 375 Mass. 432, 437-438 (1974).

withdrawal, and accordingly, severance was required. Rivera claims that his right to a fair trial was violated by the repeated denial of his motions to sever his trial from that of Brown, and relatedly, that introduction of Brown's redacted statement violated his confrontation rights under *Bruton* v. *United States*, 391 U.S. 123, 137 (1968).

We conclude that no such errors occurred. We reject the defendants' remaining challenges, and we decline to exercise our extraordinary power under G. L. c. 278, § 33E, to set aside the defendants' murder convictions and order a new trial. We therefore affirm the judgments.

1. *Facts.* We recite the facts the jury could have found, reserving certain details for discussion in conjunction with the issues raised. The defendants and Young grew up in the Castle Square housing development in the South End section of Boston. Rivera and Young attended the same elementary school in the South End for about three years, and were a grade apart. Chow also had friends from Castle Square and shared several mutual acquaintances with the defendants. One such acquaintance, Jimmy Lau, saw Rivera approximately once a week during the summer of 2001. Sometime in 2001, Lau had a conflict with Chow over a drug transaction. Both were drug dealers.

In August, 2001, Young and her roommate, Janet Lee, were living in a two-bedroom apartment at 40 Parker Hill Avenue. Lee shared the larger bedroom with her boy friend, Li, and Young used the smaller bedroom. Chow was temporarily staying at the apartment and was sleeping on an air mattress in the living room. Chow kept his belongings in black duffel bags that he stored in Lee's bedroom and in the hall closet. Chow was selling "Ecstasy" and marijuana out of the apartment.

On the morning of the murders, Lee left for work at approximately 7:30 A.M. Young was taking the day off from work because it was her son's birthday, and was doing laundry before going to pick up her son. Li and Chow were asleep. Shortly before 11 A.M., Li woke up and heard Young talking on the telephone with her son.

Around 11 A.M., Young answered a knock at the apartment door. Two men entered the apartment, pushing Young to the floor. Both men were wearing "dust masks," and both were

armed. Li emerged from his bedroom and saw a "chubbier" Hispanic man standing over Young and a skinnier African-American man on top of Chow, who was lying on his air mattress. Li then attempted to locate a weapon in his bedroom to defend himself, but returned to the living room unarmed after hearing one of the men say, "Go get the guy in the room." At this point, the African-American man pointed a black, revolver-like firearm at Li and ordered him to lie down on the air mattress next to Chow.

The African-American used duct tape to bind Young's ankles and bind her wrists behind her back. He similarly bound Li and Chow. As he was being bound, Li heard Young struggling with her assailant in the kitchen and heard the coffeepot break. While this was occurring, Li heard Young say, "Nathan, is that you? Why are you doing this? We grew up together." After Young spoke, the assailants told her, "Shut up," and the Hispanic man said "Bone, take care of this."[4]

The assailants moved Young to the bed in Lee's bedroom. One or both of them searched the bedroom for drugs and money. Having found nothing, the Hispanic man returned to the living room and asked Chow, "Where's the drugs and money?" to which Chow replied, "There is no more."

Five to ten seconds later, Young was shot six times in the head. Before she was shot, a thin black sweater was placed over her head. A few seconds later, Li felt a towel placed over his head. Chow, who was next to Li on the air mattress, was then shot in the head. Li turned to the right and saw the Hispanic man pointing a silver, semiautomatic handgun at his head. The man pulled the trigger two or three times, but Li heard only a clicking sound, suggesting the gun was out of ammunition. At this point, Li heard the sounds of someone leaving the apartment, but could not tell if it was one assailant or both. Li freed himself from the duct tape, grabbed a sword that was on display in the living room, and went outside to chase after the assailants. He saw the men walking up the street but decided not to pursue them. He returned to the apartment and telephoned 911.

Young died instantly. Chow was transported to a hospital,

---

[4]Brown's nickname was "T-Bone."

where he was pronounced dead. Li was taken to the Boston police station area B-2, where he was interviewed by Sergeant Detective Daniel J. Coleman, who was in charge of the homicide investigation. Li provided descriptions of the assailants and what had occurred, including Young's use of the name "Nathan."

The police recovered a number of items of evidence from the apartment, including a used roll of duct tape, seven spent .380 caliber shell casings, over $14,000 in cash, 180 Ecstasy tablets, and small amounts of other drugs. All seven casings were fired from the same gun. On the duct tape, the police found a print from Brown's right thumb.

a. *Brown's arrest and statement.* Sergeant Detective Coleman testified at trial that as a result of the fingerprint identification, Brown, an African-American, was arrested on August 14, 2001, and brought to the homicide unit at Boston police headquarters. At approximately 2:35 P.M., after reviewing and signing a Miranda warning form, Brown agreed to speak with Coleman and Detective Robert Kenney and an unrecorded interview began. At first, Brown repeatedly denied that he had ever been to 40 Parker Hill Avenue or had any knowledge of that address.

About fifty minutes into the interview, Coleman revealed to Brown that the police had recovered his fingerprint from a roll of duct tape found at the scene. Coleman demonstrated to Brown how the location of his print within the roll indicated that he must have been one of the last people to touch the roll, after it had been used to bind the victims. Faced with this evidence, Brown admitted some involvement in the crime. He told Coleman that on August 10, he had gone to a location in the Dorchester section of Boston, then to a hardware store in the South End, and then directly to 40 Parker Hill Avenue. At 40 Parker Hill Avenue, an Asian girl named Karen whom he knew from Castle Square had opened the door. He admitted taping all three occupants, but denied wearing a mask. He claimed that after he taped the victims, he left and went outside to a vehicle. He claimed that all three occupants were alive when he left the apartment and he denied killing anyone.[5]

---

[5]Brown made both an unrecorded and a nearly identical recorded statement. Sergeant Detective Coleman's testimony regarding the unrecorded statement omitted any references to Rivera's involvement.

At approximately 3:55 P.M., Coleman was informed that Attorney Sydney Milgram had called the police station to notify the police that he represented Brown. The interview ceased and Brown was informed of Attorney Milgram's telephone call. Brown agreed to proceed with the interview without Milgram's presence.[6] At 4:05 P.M., Coleman began to tape record the interview, going back over the story that Brown had told the detectives during the unrecorded discussion concerning his involvement in the crime. A redacted version of that tape recorded statement (omitting any reference to Rivera) was played for the jury at trial.

b. *Rivera's arrest and alibi.* Rivera was arrested on August 16, 2001. A recorded statement he made to police, in which he stated that he was friends with Brown but denied any involvement in the crime, was admitted in evidence. In his statement, Rivera claimed he was watching his two younger sisters at the time of the murders. At trial, Sharon Jones, a coworker of Rivera's mother, Awilda Torres, testified that Torres had brought her two daughters to work with her on August 10, 2001, and that Rivera had come by the office to pick them up around 1 P.M. (approximately two hours after the murders). Rivera's girl friend, Madelyn O'Neal, on the other hand, testified that she went to Rivera's apartment around 11:15 A.M., and that Rivera and his two sisters were there. However, she also testified that she had picked up some photographs at a pharmacy in the Uphams Corner neighborhood of Dorchester before taking a bus to Rivera's apartment at Castle Square. Records from the pharmacy showed that the film was purchased at 11:31 A.M. Telephone records indicated that Rivera called Brown three times that morning, at 8:46 A.M., 8:55 A.M., and 8:56 A.M.

2. *Motion to suppress Brown's statement to police.* Brown filed a motion to suppress any statements made to the police after Attorney Milgram's telephone call, most particularly Brown's recorded statement. Following an evidentiary hearing, the motion judge made findings of fact, which we summarize here.[7]

---

[6]Brown filed a motion to suppress statements he made after Attorney Milgram's telephone call, which the judge denied. See *infra.*

[7]Attorneys Sydney Milgram and Jack Milgram testified at the suppression hearing regarding the content of Sydney's telephone call to the police informing

At 3:50 P.M., approximately one hour and fifteen minutes after the detectives began interviewing Brown, Attorney Milgram telephoned the Boston police department and was transferred to the homicide unit. He was told that Brown was indeed at the homicide unit and had been charged with murder. Milgram told the individual who answered the phone that he had been retained by Brown's family to represent Brown. He said that he did not want police talking to his client and that he would be arriving at the homicide unit shortly. The individual with whom he spoke said that he would "convey the message."

Coleman was informed of Milgram's telephone call shortly after it was received. He immediately told Brown that an Attorney Milgram had called the homicide unit indicating that he represented Brown and was on his way. He asked Brown if he wanted to wait for the lawyer to arrive or continue with the interview.[8] Brown told Coleman that he wanted to continue without an attorney present. Coleman suspended the interview for five to ten minutes, and when it resumed, Coleman received Brown's consent to tape record the remainder of it. The tape recording began at 4:05 P.M. Brown reiterated his willingness to continue the interview without an attorney present. The tape recorded interview proceeded for another fifteen minutes, concluding at 4:20 P.M. In the tape recorded interview, Brown repeated his earlier claims regarding his own and Rivera's involvement in the crime.[9]

them that he represented Brown. The parties stipulated to the remaining facts, and the motion judge also apparently relied on the transcript of Brown's recorded interview in making her ruling.

[8]On appeal, Brown contends that the motion judge's finding that Coleman told Brown that Attorney Milgram was on his way was "largely speculative." He bases this assertion on the fact that Coleman did not testify at the suppression hearing and the only reference in the recorded portion of the interview to Milgram being on his way is Coleman's statement to Brown, "we can continue on with the interview while we're waiting for your attorney." At the hearing, the parties stipulated to the majority of the facts, including the content of Coleman's presumptive testimony, and the judge heard testimony on the only disputed fact, namely, what exactly Milgram had told the police during the telephone conversation. Any error in this regard is thus unpreserved. The stipulated facts clearly state that Coleman conveyed to Brown the information that Milgram "was on his way to the Homicide Unit," and the interview transcript supports this view.

[9]References to Rivera were of course redacted from the recording that was admitted in evidence at trial and played for the jury. See *infra*.

As the tape-recorded portion of the statement was taking place, Milgram and his son (also a lawyer) were driving to the police headquarters on Ruggles Street. They arrived at the homicide unit at about 4:30 P.M., approximately ten minutes after the interview had concluded. The attorneys waited for approximately twenty minutes and were then informed that Brown had been taken to the police station in the Roxbury section of Boston for booking. Milgram went to that location, where he waited for another hour. He finally made contact with Brown sometime after 6 P.M.[10]

The motion judge acknowledged that there was some dispute whether the entirety of Milgram's message was conveyed to Coleman, and specifically whether Coleman was told that Milgram did not want him talking to Brown. The motion judge concluded that the dispute was not a material one, and ruled on the motion to suppress on the assumption that the entire message had been relayed to Coleman.

On appeal, Brown challenges the denial of his motion to suppress, arguing that, although Coleman informed him that Attorney Milgram had called on his behalf and was on his way, Coleman failed to convey to Brown the message that Milgram did not want the police to talk to him. Brown claims that that failure violated his right to counsel under art. 12. In support of this claim, Brown principally relies on our holdings in *Commonwealth* v. *Mavredakis*, 430 Mass. 848 (2000) (*Mavredakis*), and *Commonwealth* v. *McNulty*, 458 Mass. 305 (2010) (*McNulty*).[11]

In *Moran* v. *Burbine*, 475 U.S. 412 (1986), the United States Supreme Court held that the police had no duty under the Fifth or Sixth Amendment to the United States Constitution to inform a suspect in custody of an attorney's efforts to render legal services where the suspect had not personally requested such legal representation. In *Mavredakis, supra* at 858-859, we rejected the

---

[10]On appeal, Brown concedes that because Milgram arrived at police headquarters after the interview had already concluded, it is not directly relevant that the police made him wait for fifteen minutes before informing him that Brown had been transferred to another station for booking.

[11]On appeal, Rivera argues that he has "target standing" to challenge the constitutionality of Brown's interrogation. Because we conclude that the motion to suppress Brown's statement was properly denied, we need not address Rivera's claim. In any event, the statement was only admitted against Brown.

rule of *Moran* v. *Burbine, supra,* in light of our historical position that "art. 12 requires a broader interpretation [of the right against self-incrimination] than that of the Fifth Amendment." *Mavredakis, supra* at 858, quoting *Opinion of the Justices,* 412 Mass. 1201, 1210 (1992). Concluding that a suspect's knowledge of an attorney's efforts to assist him was directly relevant to his ability to knowingly and intelligently waive his Miranda rights, we held that the police had a duty to "apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel." *Mavredakis, supra* at 861, quoting *State* v. *Stoddard,* 206 Conn. 157, 169 (1988).[12] The *Mavredakis* duty is expressed as follows:

> "When an attorney identifies himself or herself to the police as counsel acting on a suspect's behalf, the police have a duty to stop questioning and to inform the suspect of the attorney's request immediately. The duty to inform applies whether the attorney telephones or arrives at the station. . . . The suspect can then choose whether to speak with the attorney, or to decline the offer of assistance. On the suspect's acceptance of this assistance, the police must suspend questioning until the suspect is afforded the opportunity to consult with the attorney either on the telephone or in person." (Citations omitted.)

*Mavredakis, supra* at 861. The failure of the police to comply with any part of this duty will ordinarily require suppression of statements made by a defendant after the failure to inform, because the prior Miranda waiver becomes " 'inoperative' for further admissions." *Id.*

In *McNulty,* we revisited the *Mavredakis* issue and clarified what types of information the police must convey to the suspect in order to satisfy their *Mavredakis* duty. The defendant in *McNulty* was in custody and had waived his Miranda rights. *Id.* at

---

[12]Our decision in *Commonwealth* v. *Mavredakis,* 430 Mass. 848 (2000) (*Mavredakis*), was consistent with our jurisprudence prior to *Moran* v. *Burbine,* 475 U.S. 412 (1986), which had articulated a similar duty but had not stated whether that duty was derived from the Federal Constitution, art. 12 of the Massachusetts Declaration of Rights, or both. See *Mavredakis, supra* at 855-856, 861; *Commonwealth* v. *Sherman,* 389 Mass. 287, 288 (1983); *Commonwealth* v. *Mahnke,* 368 Mass. 662, 691-692 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *McKenna,* 355 Mass. 313, 317-320 (1969).

312. The police began to interview the defendant, and at some point during his interview, an attorney who had been appointed to represent him telephoned the police station and identified himself as the defendant's attorney. *Id.* After being transferred several times, the attorney was able to confirm that the defendant was indeed present at the station, but the officer he spoke to told the attorney he could not speak to the defendant at that time. *Id.* at 312-313. The attorney told the officer "to tell the defendant not to talk to the police and that he [the attorney] would be there shortly." *Id.* at 313. Before relaying that message, the officer called the first assistant district attorney to ask for advice. *Id.* Following the advice he received, the officer relayed to the defendant the message that an attorney had been appointed to represent him, and the defendant could stop speaking to the officers and speak to the attorney or could keep speaking to the officers if he so chose, but omitted from the message that the attorney would be there shortly and that defendant should not speak to police. *Id.* The defendant opted to continue speaking to the officers. *Id.*

We first concluded that the failure *immediately* to notify the defendant of his attorney's efforts to contact him constituted a violation of *Mavredakis. McNulty, supra* at 315, citing *Mavredakis, supra* at 852, 861-862 (defendant's statements made any time after attorney's initial telephone call should have been suppressed); and *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 751, 753 (2002) (police must inform suspect of attorney's availability immediately; improper for police to first contact district attorney's office).

Turning to the issue of what information must be conveyed to the defendant, we held that the defendant was entitled to all four pieces of information that his attorney conveyed to the police: (1) he represented the defendant; (2) he wanted to speak to the defendant; (3) the police were to tell the defendant that the attorney said not to talk to the police; and (4) the attorney would be at the station shortly. *McNulty, supra* at 316. The defendant was entitled to all the above information because it all constituted "specific communication from his attorney that bore directly on the right to counsel." *Mavredakis, supra* at 861, quoting *State* v. *Stoddard, supra*. Of these four points, it is

the third — which requires the police to relay the attorney's advice that the defendant should not talk to the police — that is the most controversial. See *McNulty, supra* at 331 (Cordy, J., concurring); *id.* at 333-337 (Gants, J., dissenting).

In this case, Brown contends that it was a violation of *Mavredakis* and *McNulty* for the police to fail to convey the message that Attorney Milgram did not want the police talking to Brown.[13] We conclude that an attorney telling the police to tell the defendant not to talk to the police is not the same thing as an attorney telling the police not to talk to the defendant; one is legal advice aimed at the defendant, the other is an attempt by the attorney to invoke his client's right to silence. Although we do not disturb our holding in *McNulty* that police have a duty to convey an attorney's advice not to speak to the police, we decline to extend *McNulty* to a situation where the attorney merely instructs the police not to talk to his client. See *Commonwealth* v. *Collins,* 440 Mass. 475, 479 n.3 (2003) (*Mavredakis* did not change principle that responsibility for invoking Miranda protections "rests squarely in the hands of criminal defendants"); *Commonwealth* v. *Beland,* 436 Mass. 273, 288 (2002). Cf. *Commonwealth* v. *Vao Sok, supra* at 751-752. Accordingly, the police had no duty to convey that part of Attorney Milgram's message to Brown, and his statements following Milgram's telephone call were properly admissible.[14] As we held in *Commonwealth* v. *Vao Sok, supra,* "an attorney's directive to the police to stop questioning the defendant requires only that they terminate questioning long enough to afford the defendant the opportunity to avail himself of the attorney's advice." That is what occurred in this case. Although *McNulty* undoubtedly expanded the *Mavredakis* duty, it did so narrowly.[15]

---

[13]We note that *Commonwealth* v. *McNulty,* 458 Mass. 305 (2010) (*McNulty*) was decided in 2010, and thus neither the motion judge nor the trial judge in this case could have relied on it in determining the admissibility of the statements.

[14]In *Commonwealth* v. *Morales,* 461 Mass. 765, 773, 780 & n.3 (2012), the attorney's message not conveyed to the defendant was variously characterized as not wanting "the defendant answering any more questions" and not wanting "the defendant to be questioned further." We assumed there to be a violation of *McNulty* but found it to be harmless. *Id.* at 780-781.

[15]Even if we were to conclude that the failure to relay the entirety of Mil-

3. *Use of redacted statement at trial.* To allow Brown's statement to police to be used against him at the joint trial of Brown and Rivera, the statement was redacted to exclude any reference to Rivera's involvement in the crime.[16] The trial judge instructed the jury, both at the time of the statement's admission and during his final charge, that the statement was to be considered solely as evidence in the case against Brown. Both defendants objected to the admission of the redacted statement, and both defendants challenge its admission on appeal.

a. *Rivera's* Bruton *objection.* Rivera appeals from the denial of his repeated motions to exclude the redacted statement, as well as repeated motions to sever on the grounds that use of the statement at a joint trial violated Rivera's due process rights to a fair trial and his rights to confront his accusers. In making this

gram's message constituted error under either *Mavredakis* or *McNulty*, any such error was harmless beyond a reasonable doubt. The recorded statement that Brown made after Milgram called merely repeated what he had already confessed to police: that he had gone to the hardware store; then to 40 Parker Hill Avenue, where he was recognized by Young; that he had bound the wrists and ankles of the victims with duct tape; and then left the apartment with all three victims still alive. Coleman testified to the content of the unrecorded statement at trial, which was made following a valid Miranda waiver. As Brown concedes, the recording contained potentially exculpatory statements regarding his claimed lack of involvement in the shootings themselves. Surely, the recorded statement confessed his involvement in the robbery, but the location of his fingerprint on the duct tape had already conclusively placed him at the scene. Given the fingerprint evidence, Brown's only viable defense was to claim some type of diminished culpability for the murders, and his recorded statement is consistent with that defense.

[16]Specifically, the following portions of Brown's statement were redacted from the version played to the jury: (1) that Nathan Rivera, whom Brown knew from the Castle Square housing development, had telephoned him on the morning of the murders and agreed to take him to the probation office at Dorchester District Court if he agreed to "take a ride" with Rivera after going to the probation office; (2) that after driving Brown to the probation office, Rivera drove the defendants to a hardware store in the South End and had gone in alone; (3) that Rivera had driven to 40 Parker Hill Avenue and that he and Brown had passed through the main door to the building before knocking on the victims' apartment door; (4) that Young had recognized Brown and Rivera and called Rivera "Nathan"; (5) that Rivera directed Brown to bind the victims with duct tape; (6) that at the point Brown allegedly left the apartment, Rivera was taking Young toward the back rooms of the apartment; and (7) that Brown had taken nothing from the apartment and had gone to sit in Rivera's motor vehicle until Rivera emerged from the building and did not know if Rivera had taken anything.

claim, Rivera principally relies on the rule set forth in *Bruton* v. *United States*, 391 U.S. 123, 137 (1968) (*Bruton*), which states that the introduction at a joint trial of a nontestifying codefendant's statement, which names and incriminates the other defendant, violates that defendant's right to confront his accusers under to the Sixth Amendment.

In *Bruton*, *supra* at 135-136, the Supreme Court held that where a facially incriminating confession of a nontestifying codefendant is admitted at a joint trial, a limiting instruction cannot adequately guard against the risk that the jury will rely on the confession in convicting the defendant. In a subsequent decision, *Richardson* v. *Marsh*, 481 U.S. 200, 207-208 (1987), the Supreme Court characterized *Bruton* as a "narrow exception" to the principle that jurors are presumed to follow their instructions, and held *Bruton* inapplicable where the statement is redacted to eliminate any reference to the defendant or his existence, and only becomes incriminating when contextualized by other evidence introduced at trial. In a third case, the Supreme Court held that admission of a statement that merely substituted blank spaces or the word "deleted" for the defendant's name so obviously referred to the defendant that it "facially incriminat[ed]" in a manner prohibited by *Bruton. Gray* v. *Maryland*, 523 U.S. 185, 196-197 (1998).

Our considerations of the *Bruton* rule mirror the Federal standard. See *Commonwealth* v. *James*, 424 Mass. 770, 782 (1997). " 'Where a nontestifying codefendant's statement "expressly implicate[s]" the defendant, leaving no doubt that it would prove to be "powerfully incriminating," the confrontation clause of the Sixth Amendment . . . has been offended,' notwithstanding any limiting instruction by the judge that the jury may consider the statement only against the codefendant." *Commonwealth* v. *McAfee*, 430 Mass. 483, 488 (1999), quoting *Commonwealth* v. *Blake*, 428 Mass. 57, 60 (1998). Accord *Commonwealth* v. *Vasquez*, 462 Mass. 827, 841-844 (2012). However, where a codefendant's statement becomes incriminating only when taken in context with other evidence adduced at trial, a limiting instruction will generally suffice to cure a violation of the defendant's confrontation rights. See *Commonwealth* v. *Blake*, *supra*. See also *Richardson* v. *Marsh*, *supra* at 208-209.

A limiting instruction is ineffective "only where the circumstances of the case and the nature of the codefendant's statement so obviously implicate the defendant in the crime itself as virtually to constitute direct incrimination." *Commonwealth* v. *Blake, supra*, quoting *Commonwealth* v. *James, supra* at 783. See *Gray* v. *Maryland, supra*.

Rivera argues that several portions of Brown's redacted statement suggest the statement was edited and likely implied the involvement of another individual in the crime, whom the jury would infer was Rivera. These portions include Brown's claim that he had "some involvement" in the crime, the fact that Brown "[took] a ride" to the hardware store, and the fact that Brown left the apartment with all three victims alive and went to the vehicle and "waited to find out what was going on."[17] Certainly, where one defendant gives an account of his and a coventurer's commission of a crime, it would be a rare case where the process of redaction did not leave behind some peculiar language and awkward transitions. The law is clear, however, that inferential incrimination can be properly cured by a limiting instruction, even in cases where the inference is more inculpatory than here. See *Richardson* v. *Marsh, supra* at 203-204 n.1, 208 (when linked with respondent's own testimony, redacted statement placed respondent in vehicle at time murder plan was being discussed); *Commonwealth* v. *Vasquez, supra* at 841-845 (no *Bruton* violation in admitting nontestifying codefendant's statement that he opposed plan to murder but "other members [of the gang] threatened to kill him"); *Commonwealth* v. *Wilson*, 46 Mass. App. Ct. 292, 294, 298 (1999) (admission of nontestifying codefendant's bare statement that "[w]e stabbed" victim did not violate *Bruton* by suggesting involvement of one or more other perpetrators). Cf. *Commonwealth* v. *James, supra* at 781-784 (no *Bruton* violation where statement explicitly placed codefendants together on night of murder in what proved to be "demonstrably false alibi"). But see *Commonwealth* v. *Baciga-*

_____

[17]Rivera additionally cites, as examples of implicit references to his own involvement, references to "dust masks" (plural); a question regarding whether Brown heard gunshots after leaving the apartment; and an awkward transition from a discussion of Young opening the door to a discussion of the gray color of the tape used to bind the victims, which Rivera contends, suggests to the jury that the statement was edited.

*lupo*, 455 Mass. 485, 493-495 (2009) (admission of codefendant's statement that he and his "friend" had committed killings, in circumstances of case, violated *Bruton* rule).

The trial judge in this case gave adequate limiting instructions on multiple occasions. Brown's redacted statement incriminates Rivera only to the extent that the jury accept the other evidence against him that places him at the scene. This will be the case in virtually any joint trial in which such a statement is admitted. The admission of such a statement — which only implicates the codefendant circumstantially when combined with other evidence in the case — does not offend *Bruton* or its progeny. Consequently, the judge did not abuse his discretion by admitting the redacted statement and denying Rivera's motions to sever the trials on this basis.

b. *Brown's objection.* Brown appeals on the grounds that the redacted version of his statement violated the rule of verbal completeness and violated his due process right to a fair trial by impairing his ability to present a defense of withdrawal. Because *Bruton* required the redaction of Brown's statement for use at a joint trial, Brown's argument in this regard is tantamount to an argument that severance was required. Cf. *Commonwealth* v. *Best*, 381 Mass. 472, 489 (1980) (argument "not so much grounded on the failure to sever as on the right to cross-examine adequately"). In other words, it would have been impossible to create (and admit) a version of the statement that both assuaged Brown's verbal completeness concerns *and* satisfied *Bruton* as to Rivera. Therefore, we consider these arguments as one.

"Absent a constitutional requirement for severance, joinder and severance are matters committed to the sound discretion of the trial judge." *Commonwealth* v. *Vasquez, supra* at 836, quoting *Commonwealth* v. *McAfee, supra* at 485; *Commonwealth* v. *Moran*, 387 Mass. 644, 658-659 (1982). A judge's refusal to allow a motion for severance constitutes an abuse of discretion only when "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Vasquez, supra*, quoting *Commonwealth* v. *Moran, supra* at 658. Critically, in order to show such prejudice, "it is not enough that the defendants are hostile to one another or that one defendant would have a better chance of acquittal if

tried alone." *Commonwealth* v. *McAfee, supra* at 486. Severance is required "only if [the codefendants'] defenses conflict to the point of being mutually antagonistic and irreconcilable." *Id.*

The judge did not abuse his discretion in denying Brown's motion to sever. The defenses offered by the two codefendants were not in conflict, let alone irreconcilable, notwithstanding the admission of Brown's redacted statement. See *id.* (severance not required where defendant claimed misidentification, and codefendant claimed diminished culpability on grounds that his companion, whom he did not identify as defendant, was actual shooter). Here, Rivera presented an alibi defense and Brown claimed he had withdrawn from any joint venture prior to the murders. The factual similarity to *McAfee* is striking. See *id.* See also *Commonwealth* v. *Clarke*, 418 Mass. 207, 217 (1994) (defenses not mutually antagonistic where one defendant claimed he was present at crime scene but not participant, and other defendant claimed prosecution witnesses not credible); *Commonwealth* v. *Craig C.*, 44 Mass. App. Ct. 209, 216 (1998) (severance not warranted where defendant claimed to be "merely a bystander" at crime scene and codefendant claimed eyewitness misidentified him as shooter).

If the redactions in any way curtailed Brown's ability to present his withdrawal defense, the impact was so slight that it fails to approach the threshold for mandatory severance. See *Commonwealth* v. *McAfee, supra* at 486-487; *Commonwealth* v. *Moran, supra.* Specifically, Brown contends that three pieces of information that were redacted from his statement support his defense of withdrawal, and generally serve to limit the extent of his culpability for the incident: (1) Rivera had telephoned Brown and asked him to accompany him on a ride, provided the vehicle, and Rivera alone had purchased the duct tape; (2) Rivera had "engineered their entry" into the apartment and may not have brandished a gun until after they entered the apartment; and (3) Brown bound the occupants with duct tape only after Rivera had brandished a gun,[18] and Rivera remained in the apartment

---

[18]Brown did not present a defense of duress at trial, so the significance of this fact is unclear. Brown does not claim that Rivera pointed a gun at him or threatened him in any way when Rivera directed him to bind the victims.

after Brown left with all three occupants still alive. Even assuming the jury would have credited Brown's version of events given the context provided by his unredacted statement, at best, the jury may have concluded on those facts that the robbery was Rivera's idea, that Brown did not actually pull the trigger, and that he had left the apartment just before the murders. However, to the extent there was any evidence that Brown actually withdrew from the joint venture in a manner that would absolve him of liability for the murders, Brown was able to adduce adequately this evidence through his redacted statement, Sergeant Detective Coleman's testimony about the unrecorded segment of their interview, Wei Li's testimony regarding Rivera's role in the crime, and Rivera's telephone records indicating that he contacted Brown three times on the morning of the murders.[19] See *Commonwealth* v. *Craig C.*, *supra* ("While the admission of [the nontestifying witness's] entire statement would have emphasized further the defendant's contention that he [was not a joint venturer as to murder], the defendant was able to present that evidence by other means"). See also *Commonwealth* v. *Smith*, 418 Mass. 120, 127-128 (1994) (to extent that excluded testimony potentially supported defendant's chosen theory of defense, adequate evidence remained for defendant to pursue theory). We need not decide whether the rule of verbal completeness would have entitled Brown to present the redacted portions of his statement at a severed trial. As long as the decision to deny severance — made with the understanding that a joint trial would mandate redaction — was proper, Brown's verbal completeness argument must fail.

Moreover, the fact that the unredacted statement may have had a greater tendency to suggest that Rivera was the ringleader is of no consequence on the facts of this case. Brown's admitted role in this crime was hardly "minimal." He participated in an armed assault in a dwelling, and admitted to binding three victims, two of whom were essentially executed during the crime.

4. *Jury instructions on withdrawal from a joint venture.* The judge instructed the jury on withdrawal from a joint venture pursuant to the model jury instruction, based on the language

---

[19]The telephone calls tend to show that the plan originated with Rivera.

set forth in *Commonwealth* v. *Pucillo*, 427 Mass. 108, 115-116 (1998), and *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 (1988).[20] Brown argues that the model instruction unfairly shifted the burden of persuasion to the defense, and therefore that the judge's reliance on it in instructing the jury presents a substantial likelihood of a miscarriage of justice. Because we conclude that the evidence in this case was insufficient to warrant an instruction on withdrawal, we need not address the merits of Brown's argument.

"In order to support a theory of withdrawal or abandonment of a joint venture, there must be at least an appreciable interval between the alleged termination and [the commission of the crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it." *Commonwealth* v. *Miranda*, 458 Mass. 100, 118 (2010), quoting *Commonwealth* v. *Cook*, 419 Mass. 192, 202 (1994) (defendant not entitled to withdrawal instruction where no evidence he announced or notified codefendant of his intent to withdraw and no "appreciable interval" between alleged withdrawal and the crime).

All of our decisions considering the defense of withdrawal from a joint venture turn on the interval between the alleged withdrawal and the crime, and the extent to which the defendant communicated the fact of his withdrawal to the other participants. See, e.g., *Commonwealth* v. *Miranda*, *supra* (defendant not entitled to withdrawal instruction where he handed gun to his brother immediately before victim was shot, and no

---

[20]As given, the instructions stated:

"Now the defendant is not guilty of a crime committed by joint venture if he withdrew from or abandoned the joint venture in a timely and effective manner. A withdrawal is effective only if it is communicated to the other person in the joint venture, and only if it is communicated to [him] early enough so that he had a reasonable opportunity to abandon the crime as well. If the withdrawal comes so late that the crime cannot be stopped, it is too late and ineffective. If there is evidence of withdrawal, the Commonwealth must prove beyond a reasonable doubt that the defendant did not abandon or withdraw before you can find him guilty as a joint venturer."

evidence presented as to what was said); *Commonwealth* v. *Elliot*, 430 Mass. 498, 500-501 & n.3 (1999) (defendant not entitled to withdrawal instruction where he pointed rifle at victim, did not shoot, but instead handed weapon to codefendant with knowledge of his murderous intent, and codefendant shot victim); *Commonwealth* v. *Cook*, *supra* at 201-202 (evidence that defendant may have left scene of beating before coventurer stabbed victim insufficient to warrant withdrawal instruction where no evidence of communicated withdrawal or appreciable interval). But see *Commonwealth* v. *Fickett*, *supra* at 200-201 (refusal to give withdrawal instruction error where defendant had told both codefendant and third party that he "didn't want nothing to do with what we had discussed" and asked codefendant to drop him off somewhere prior to murder).

Brown erroneously relies on *Commonwealth* v. *Allen*, 430 Mass. 252, 257-258 (1999), in support of the argument that he was entitled to a withdrawal instruction. Critical to our holding in the *Allen* case was the fact that the defendant had told his codefendant that he "did not want to go through with the robbery," the codefendant threatened him to continue, and while present at the scene, he had "no active involvement in killing [the victim] or in the robbery." *Id.* at 254-255, 257-258 (concluding withdrawal defense was viable in response to claim of ineffective assistance of counsel for not pursuing different defense).

Here, there was no evidence on which a jury could conclude that Brown effectively withdrew from the joint venture prior to the murders. Even if the jury believed that Brown had physically left the apartment prior to the shootings, there was no evidence to suggest that Brown communicated to Rivera any intent to withdraw. The mere act of leaving the apartment just prior to the murders is insufficient to constitute a communication of an intent to withdraw,[21] but even if it could, any such

---

[21]Brown cites to *Commonwealth* v. *Smiley*, 431 Mass. 477, 488-489 (2000), for the proposition that withdrawal may be effectively communicated by an "act of detachment." The *Smiley* case, among other things, held proper a jury instruction stating that the "communication does not have to be oral, it can be by other means," including conduct. *Id.* at 487-488 n.8. The defendant in that case "protest[ed]" a coventurer's shooting of one of the victims, and "ran out of the apartment" with his other coventurers while the one who had shot the first victim carried out a "shooting rampage" inside. *Id.* at 478-479.

withdrawal was untimely. In a matter of seconds, two of the three victims had been shot in the head. There was no evidence of an "appreciable interval" between this alleged withdrawal and the murders, or that the detachment occurred before the murders had "become so probable that [they could not] reasonably be stayed." *Commonwealth* v. *Miranda, supra.* Brown bound all three victims, rendering them defenseless during the commission of an armed home invasion and drug robbery. He knew that at least one victim, Karen Young, had recognized him and Rivera and identified Rivera by name, which provided Rivera with an increased motive to kill the victims even if he had not planned to do so originally. In the face of these facts, simply leaving the apartment prior to the trigger being pulled does not create a sufficient basis for a jury to conclude that Brown had withdrawn from the venture prior to the murders. Indeed, at that point, the home invasion — which the jury found as a predicate felony for the felony-murder conviction — had already been completed, with Brown's full participation.

5. *Substitute medical examiner's testimony.* The chief medical examiner for the Commonwealth, Dr. Mark Flomenbaum, testified at trial as a substitute medical examiner. Dr. Jennifer Lipman, who performed the autopsies of Young and Chow, was no longer employed in the medical examiner's office at the time of trial, but no inquiry was made as to her unavailability as a witness. Although this testimony was not objected to at trial on confrontation grounds, Rivera contends on appeal that Dr. Flomenbaum's opinion testimony on the victims' causes of death and related matters violated his confrontation rights. Rivera also objects on appeal to the admission of Young and Chow's autopsy photographs through Dr. Flomenbaum on authentication grounds.

In *Commonwealth* v. *Nardi*, 452 Mass. 379, 388 (2008), we reaffirmed our position that "[medical] examiners, as expert witnesses, may base their opinions on (1) facts personally observed; (2) evidence already in the records or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." *Id.*, quoting

*Commonwealth* v. *Markvart,* 437 Mass. 331, 337 (2002). See
*Commonwealth* v. *Durand,* 457 Mass. 574, 584 (2010).
"However, a testifying medical examiner called by the Com-
monwealth is not permitted to testify, on direct examination, to
the underlying factual findings contained in the autopsy report
prepared by a different medical examiner, because such testimony
would violate a defendant's confrontation rights." *Id.* at 584-
585, citing *Commonwealth* v. *Nardi, supra* at 391.

While not permitted to testify to the underlying factual find-
ings of an autopsy he did not perform, a substitute medical
examiner (or other expert) may nevertheless base his opinions
on those factual findings. *Commonwealth* v. *Nardi, supra* at
388-391 (substitute medical examiner may give opinion concern-
ing cause of death even though testimony is based principally
on autopsy performed by unavailable pathologist). Similarly, a
substitute medical examiner may base his opinion on autopsy
photographs that are otherwise admissible but were not admitted
— or were admitted improperly due to lack of authentication.
*Commonwealth* v. *Rogers,* 459 Mass. 249, 265-266 n.18 (2011).

Dr. Flomenbaum did testify to some of the factual findings
contained in the reports prepared by the absent medical examiner.
For example, he testified to the height and weight of the victims
and the nature and location of the gunshot wounds to their
heads. More important, however, he testified that, based on the
information contained in the autopsy reports and the autopsy
photographs, it was his opinion that Chow was shot at point-
blank range with the barrel of the gun pressed up against his
scalp and that although it might have appeared that Chow was
breathing, that his body would not have been "functioning in a
way that it will sustain life." As to Young, Flomenbaum testi-
fied as to his opinion that she too was shot at extremely close
range, and that each one of the six gunshot wounds she sustained
would have been independently fatal and the first shot would
have rendered her "almost instantaneously dead."

To the extent that Dr. Flomenbaum testified to the factual
findings contained in the autopsy report, this was error. However,
any opinions he rendered based on the factual findings contained
in the autopsy reports were properly admissible as the opinion
of an expert witness. See *Commonwealth* v. *Durand, supra;*

*Commonwealth* v. *Nardi, supra.* The factual observations and findings in the reports could have been admitted if offered through Dr. Lipman, and therefore may be relied on by an expert in making an opinion. See *id.* The same is true for the autopsy photographs. See *Commonwealth* v. *Rogers, supra.* Although the photographs admitted during the testimony of Dr. Flomenbaum were not properly authenticated, and thus would not have been admitted had they been objected to on such grounds,[22] they could have been properly admitted if offered through Dr. Lipman or someone else present at the autopsy. See *Commonwealth* v. *Durand, supra* at 587 n.14; *Commonwealth* v. *Figueroa,* 56 Mass. App. Ct. 641, 646 (2002) ("Photographs usually are authenticated directly through competent testimony that the scene they show is a fair and accurate representation of something the witness actually saw"). Consequently, they were properly considered by Dr. Flomenbaum in forming his admissible opinion testimony.

Because trial counsel did not object to the testimony regarding Dr. Lipman's autopsy findings or the admission of the photographs through Dr. Flomenbaum, the confrontation clause error is unpreserved, and we review to determine whether their admission created a substantial likelihood of a miscarriage of justice.[23] See *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992).

There was no dispute as to the cause of death of either of the victims in this case. Dr. Flomenbaum's testimony was primarily intended to show that Rivera used disproportionate force in killing Young, in support of the Commonwealth's theory that Young's murder was committed with extreme atrocity or cruelty. Counsel for Rivera concedes as much in his brief. Flomenbaum's testimony was not the only evidence of extreme atrocity or cruelty, however. There is ample evidence throughout the record that Young had been duct taped, had her head and face covered, and was shot six times in the head at close range. The

---

[22]Counsel for Brown objected to the admission of the photographs on the ground that they were inflammatory and unfairly prejudicial, and the judge overruled his objection. Neither party objected to the improper authentication now advanced on appeal.

[23]The Commonwealth also sought to admit Young and Chow's autopsy reports through Dr. Flomenbaum. Counsel for Brown objected on hearsay grounds, and the judge ruled the reports inadmissible.

only pertinent piece of Flomenbaum's testimony that was not cumulative of other evidence was his opinion that each of the gunshot wounds would have been independently fatal and the first wound would have caused death instantaneously, and as discussed, *infra*, this opinion was properly admissible. Similarly, although the autopsy photographs were admitted without proper authentication, in light of the other evidence adduced at trial, they were of limited probative value. Accordingly, we conclude that despite the errors, there is no substantial likelihood of a miscarriage of justice.

6. *The prosecutor's closing argument.* Rivera contends that the prosecutor engaged in improper argument by "implicitly invit[ing] the jury to violate *Bruton*" in his closing argument. Specifically, Rivera objects to the prosecutor suggesting that Brown committed the crime with someone he knew,[24] and before listing off a number of witnesses who testified that Brown knew Rivera, said: "How do we know [Terrence Brown knows Nathan Rivera]? We know it from Mr. Brown. We know it from Mr. Rivera. We know it from George Kalil. We know it from Cruz Leon. All these people say, and Jimmy Lau, in fact. All these people say that these two are friends." Rivera also contends it was improper for the prosecutor to argue to the jury that, when determining whether Rivera lied in his statement to police, the jury should "[c]ontrast the two statements in terms of who is being truthful, who's playing games."

The prosecutor's remark that "[w]e know it from Mr. Brown" was improper because it stated facts not in evidence. Brown did admit to knowing Rivera, but the redacted version of his statement introduced at trial eliminated all references to Rivera. There was no objection to the prosecutor's remark, so we review for a substantial likelihood of a miscarriage of justice. Given the abundant evidence on the topic — including the testimony of several witnesses and *Rivera's own statement to police* in

---

[24]The prosecutor argued: "Ladies and gentlemen, would it offend anyone's common sense if someone was to suggest to you that Terrence Brown did this with a stranger, somebody he didn't know? Of course it would. Terrence Brown went there with a friend. You don't go to rob a drug dealer with somebody you don't know, somebody you don't trust, somebody you don't rely on, can't rely on. You do this crime, you try to rob a drug dealer with somebody you know."

which he admitted that he and Brown were friends — we conclude that the statement, although improper, had a negligible effect on the jury. As to the suggestion that the jury "contrast" Rivera's and Brown's statements to determine who was being truthful and who was not, we do not agree that the prosecutor was inviting the jury to violate *Bruton*. The prosecutor was merely arguing, as supported by the evidence, that Brown had at least been somewhat truthful regarding his involvement in the crime, whereas Rivera had obfuscated, provided a false alibi, and denied any involvement in the face of substantial evidence to the contrary.

7. *Motion for postverdict evidentiary hearing.* Each defendant appeals from the denial of a joint motion for an evidentiary hearing regarding "whether or not, and if so, the extent to which, there were improper discussions in the jury room about whether the police questioned Brown about [Rivera's] participation in the crimes." The defendants filed this motion after the prosecutor brought to the judge's attention, prior to sentencing, that after the jury returned their verdicts, one juror had telephoned him asking questions about the case. The juror asked the prosecutor why the case had taken so long to reach trial,[25] to which the prosecutor replied that murder cases typically take years, particularly when multiple defendants are involved. The juror then asked whether the police ever questioned Brown about Rivera's involvement. The prosecutor replied that they had, but reminded the juror that what one defendant says about another defendant is inadmissible as to the other defendant, to which the juror replied that he understood. The judge denied the motion for an evidentiary hearing because he concluded that there was no suggestion that any extraneous influences invaded the jury's deliberation.

A trial judge has "broad discretion 'to determine what manner of hearing, if any, is warranted.' " *Commonwealth* v. *Dixon*, 395 Mass. 149, 151 (1985), quoting *United States* v. *Campbell*, 684 F.2d 141, 151 (D.C. Cir. 1982). "No duty to investigate arises unless the court finds some suggestion or showing that extraneous matters were brought into the jury's deliberations."

---

[25]The defendants were indicted on September 26, 2001, and jury empanelment began on July 7, 2006.

*Commonwealth* v. *Dixon, supra,* citing *Commonwealth* v. *Fidler,* 377 Mass. 192, 203 (1979). The party seeking the inquiry must show more than mere speculation. *Commonwealth* v. *Dixon, supra* at 152. As *Commonwealth* v. *Fidler, supra* at 198-199, makes clear, even if it can be shown that jurors discussed matters they were instructed to disregard or evidence struck by the judge, such matters are not considered extraneous influences but rather are "part of the internal decision making process of jury deliberations." Here, the juror's questions to the prosecutor indicated that some members of the jury may have found it odd that Brown made no mention of Rivera in his statement to police or, at worst, even questioned whether the statement had been altered. There was nothing in the telephone call to suggest any extraneous influence. The judge was well within his discretion in denying the motion.

8. *Brown's request to dismiss the home invasion conviction.* The jury identified two predicate felonies for the felony-murder conviction: home invasion and attempted armed robbery. At the sentencing, the prosecutor asked that the home invasion charge be identified as the predicate felony and the conviction on that charge be placed on file without a sentence being imposed. Brown objected to the conviction being placed on file, and it was ordered filed over his objection. See note 3, *supra.* On appeal, he now asks that the home invasion conviction be dismissed, as duplicative of his felony-murder conviction.

Predicate felonies must be dismissed as a matter of law. See *Commonwealth* v. *Gunter,* 427 Mass. 259, 275 (1998). Where a felony-murder conviction is based on more than one predicate felony, however, only one of the underlying felonies is duplicative. See *Commonwealth* v. *Rasmusen,* 444 Mass. 657, 666-667 (2005). The defendant need not be charged — and thus need not be convicted — on the predicate felony. See *Commonwealth* v. *Stokes,* 460 Mass. 311, 315-316 (2011); *Commonwealth* v. *Matchett,* 386 Mass. 492, 497-498 & n.7 (1982). Where, as here, the jury identify an uncharged crime, attempted robbery, as the predicate felony, there is no risk of a duplicative conviction or sentence on that crime because that crime has not been charged and there is no underlying conviction. With the uncharged attempted armed robbery serving as the predicate

felony, Brown's conviction on the home invasion charge may stand. See *Commonwealth* v. *Stokes, supra.*

9. *The defendants' requests for relief under G. L. c. 278, § 33E.* Rivera and Brown alternatively request relief under G. L. c. 278, § 33E. We have reviewed the entire record of this case pursuant to our responsibilities under that section. The evidence to convict was strong, and the few identified errors did not cause prejudice. We conclude that there is no basis for reducing the defendants' degree of guilt as to the murder convictions or ordering a new trial.

*Judgments affirmed.*