CORRIGAN, J., Concurring and Dissenting.
In People v. Dungo (2012) 55 Cal.4th 608 [147 Cal.Rptr.3d 527, 286 P.3d 442] (Dungo), a majority of this court held that a pathologist giving an opinion about a victim’s cause of death may recount “objective facts” that he did not observe, derived from an autopsy report he did not write, without running afoul of the confrontation clause. (Dungo, at p. 621.) This case demonstrates why the Dungo rule is unworkable.
In Dungo, as here, a witness described findings made by a nontestifying pathologist. Both the majority and Justice Werdegar’s concurring opinion in Dungo emphasized that the statements attributable to the absent pathologist were limited to “anatomical and physiological observations” of the victim’s body at the autopsy. (Dungo, supra, 55 Cal.4th at p. 619; id. at p. 621 (conc. opn. of Werdegar, J.).) Justice Werdegar suggested, “[t]he process of systematically examining the decedent’s body and recording the resulting observations is . . . governed primarily by medical standards rather than by legal *769 requirements of formality or solemnity” and that such observations do not “resemble the ex parte examinations of historical example or the structured police interrogations of Crawford [v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]] and Davis [v. Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266]].” (Dungo, at p. 624 (conc. opn. of Werdegar, J.).) The suggestion is that the recordation of medical observations is purely objective and mechanical. My colleagues contrast them with medical conclusions, which result from applying a pathologist’s expertise to a set of objective facts, in order to draw particular conclusions. There is no debate that admission of testimony as to medical conclusions reached by a nontestifying expert would violate the confrontation clause. The Dungo majority and concurrences concluded, however, that hearsay statements about medical observations may be admissible.
The line between an inadmissible statement amounting to a conclusion, and an admissible statement about an observation, is not as bright as Dungo suggests. This case further blurs that distinction. As examples, Dr. Fukumoto testified regarding the following statements Dr. Richards made in his report. The victim (a) had suffered an incisional tear in her left eardrum, suggesting it had been caused by a sharp instrument; (b) had ankle lacerations “going in an upward direction,” suggesting it was caused by a ligature; (c) had a “crescent” on the bridge of her nose consistent with a fracture, even though Richards saw no indication of a fracture on an x-ray; and (d) had residue near her mouth consistent with adhesive tape.
The defense contested all of these statements. Its expert, Dr. Wolf, testified the victim’s eardrums could have been tom from increased pressure during strangulation, rather than incised by an instrument. Wolf concluded one could not determine whether a tear was “incisional” without a microscopic examination, which Dr. Richards did not perform. Defense counsel argued that defendant could not have had the intent to torture because he immediately rendered the victim unconscious by delivering a blow hard enough to break her nose. This scenario was inconsistent with defendant binding the victim’s ankles. Regarding the nose injury, Dr. Fukumoto testified that Richards did not see a fracture on the X-ray. Yet, Fukumoto testified he saw one, thus augmenting Richards’s credibility. Richards had failed to obtain microscopic slides of the area or to make an incision that might have confirmed a break. Finally, the defense noted that Richards never tested the substance on the victim’s face to confirm the presence of an adhesive.
Even if some of Richards’s statements can be accurately described as mere observations, the underlined portions are clearly opinions or conclusions drawn *770 from observations. The extensive testimony[1] and argument[2] regarding the credibility of the absent Richards shows how an application of Dungo can run afoul of the core purpose behind the confrontation clause. “ ‘The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' ” (Davis v. Alaska (1974) 415 U.S. 308, 315-316 [39 L.Ed.2d 347, 94 S.Ct. 1105].) “Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.” (Id. at p. 316.)
*771 In Crawford v. Washington, supra, 541 U.S. 36, the Supreme Court overruled Ohio v. Roberts (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], Under the Roberts rule, hearsay could be admitted if it bore “adequate ‘indicia of reliability.’ Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.” (Id. at p. 66.) The Crawford majority stated, “we do not think the Framers meant to leave the Sixth Amendment’s protection to the vagaries of the rules of evidence, much less to amorphous notions of ‘reliability.’ ” (Crawford, supra, 541 U.S. at p. 61.) “Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable .... Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them.” (Id. at p. 63.)
The majority here and in Dungo appear to return to a Roberts-like rule in which an “objective” observation is sufficiently reliable to avoid the requirement of confrontation. The majority here similarly rejects defendant’s claim that Dr. Fukumoto improperly recounted Dr. Richards’s opinions about the “incisional” tear in the eardrum, the fractured nose, and the presence of adhesive tape residue on the victim’s face. The majority reasons: “This testimony by Dr. Fukumoto did not, however, recount Dr. Richards’s . . . opinions . . . , but rather [Richards’s objective] medical observations . . . .” (Maj. opn., ante, at p. 708.) The majority does not explain the difference between objective medical “observations” and “opinions.” To do so undermines the analysis. That some substance is present on the face may be an observation. That it is adhesive residue is a conclusion. That the eardrum is ruptured may be an observation. That the wound was caused by a sharp instrument is an opinion based on interpretation.
In light of Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527], Bullcoming v. New Mexico (2011) 564 U.S. __ [180 L.Ed.2d 610, 131 S.Ct. 2705], and Williams v. Illinois (2012) 567 U.S. __ [183 L.Ed.2d 89, 132 S.Ct. 2221], it is by no means clear that the majority’s distinction between observations and conclusions would survive constitutional scrutiny. (See Bullcoming, supra, 564 U.S. at p. __ [131 S.Ct. at p. 2715] [“the comparative reliability of an analyst’s testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar”]; Melendez-Diaz, supra, 557 U.S. at p. 318 [“Nor is it evident that what respondent calls ‘neutral scientific testing’ is as neutral or as reliable as respondent suggests. Forensic evidence is not uniquely immune from the risk of manipulation.”]; Dungo, supra, 55 Cal.4th at pp. 639-640 (dis. opn. of Corrigan, J.).) But even if the distinction is permitted, Dr. Fukumoto repeatedly testified to Dr. Richards’s hearsay statements recounting his observations. Defendant had the right to cross-examine Richards on the methods and reasoning he used. It *772 is ultimately the jury’s role to evaluate the credibility of the person who drew the conclusions and decide for itself whether to accept them. (See Commonwealth v. Rivera (2013) 464 Mass. 56 [981 N.E.2d 171, 189] [decided after Dungo; “ ‘[A] testifying medical examiner called by the Commonwealth is not permitted to testify, on direct examination, to the underlying factual findings contained in the autopsy report prepared by a different medical examiner, because such testimony would violate a defendant’s confrontation rights.’ [Citation.]”].)
In a decision after Dungo, the New Mexico Supreme Court recently reached a similar conclusion: “[I]n material respects, the autopsy findings do not involve objective markers that any third party can examine in order to express an independent opinion as to the existence or non-existence of soot or stippling. Such observations are not based on any scientific technique that produces raw data, but depend entirely on the subjective interpretation of the observer, who in this case was [the nontestifying] Dr. Dudley. How Dr. Dudley reached the conclusion that there was no evidence of soot or stippling on Reynaldo’s body or clothing should have been the subject of cross-examination. Inquiry into her training, the equipment used to arrive at her subjective conclusion, whether the evidence of soot or stippling might have been masked by blood, or any other variables that would influence her decision should have been tested in the crucible of cross-examination.” (State v. Navarette (2013) 2013 NMSC 3 [2013 NMSC 003, 294 P.3d 435, 443].) Likewise, U.S. v. Ignasiak (11th Cir. 2012) 667 F.3d 1217 reasoned: “Medical examiners are not mere scriveners reporting machine generated raw-data. . . . [T]he observational data and conclusions contained in the autopsy reports are the product of the skill, methodology, and judgment of the highly trained examiners who actually performed the autopsy.” (Id. at p. 1232, fn. omitted.) Similarly, Dr. Richards’s conclusions here depended on his skill and interpretation of what he saw.
The majority acknowledges that Dr. Fukumoto recounted some of Dr. Richards’s opinions, including that the victim was strangled to death and that her ankle lacerations were caused by a wire ligature. However, the majority concludes “no prejudice was possible under any standard” because “Dr. Fukumoto independently agreed with Dr. Richards’s opinions, and neither the cause of death nor the source of the lacerations on Deeble’s ankle was in dispute at trial.” (Maj. opn., ante, at p. 707.) Such reasoning misses the mark. That Fukumoto reviewed microscopic slides and autopsy photographs in addition to Richards’s autopsy report hardly establishes that Fukumoto derived his opinions “independently” of Richards. As the West Virginia Supreme Court reasoned under similar circumstances: “[T]o the extent that Dr. Sabet served as a ‘transmitter’ for Dr. Livingston’s opinions regarding cause of death by reading or reiterating the conclusions contained from the report, such testimony is precisely the type of ‘surrogate’ testimony that is *773 violative of the Confrontation Clause per Bullcoming. Dr. Sabet’s seeming concurrence with the cause of death, does not transform it into his own opinion, capable of cross-examination sufficient for Confrontation Clause purposes.” (State v. Kennedy (2012) 229 W.Va. 756 [735 S.E.2d 905, 920-921].) Photos and X-rays are not hearsay. (See Evid. Code, §§ 225 [defining “statement”], 1200 [defining “hearsay evidence”].) Fukumoto could have examined photos and X-rays and given his own opinion about their significance. What he could not do is tell the jury what the absent Richards concluded. Fukumoto’s testimony that his opinions were “consistent” with Richards’s served to bolster his own credibility based on hearsay not subject to cross-examination.
For the reasons set out in my Dungo dissent, Dr. Fukumoto’s testimony violated the confrontation clause because he relayed to the jury the observations and conclusions of the nontestifying autopsy pathologist. Dr. Richards’s statements were recorded in a six-page autopsy record and a two-page histology report. Each page of both documents bears the letterhead of the Orange County Sheriff’s Department and names Brad Gates as the sheriff-coroner. Each page bears the victim’s name, the case number, and Richards’s signature. The autopsy was attended by a criminalist employed by the Orange County Sheriff-Coroner, as well as two members each from the Orange County Sheriff’s Department and the Los Angeles Police Department. These documents and the circumstances under which they were created indicate they were sufficiently formal and made with the primary purpose of establishing facts for possible use in a criminal trial. Accordingly, they are testimonial hearsay. (Dungo, supra, 55 Cal.4th at pp. 634-646 (dis. opn. of Corrigan, J.).)
Dr. Fukumoto’s testimony was prejudicial with respect to the torture-murder special circumstance. “ ‘Confrontation clause violations are subject to federal harmless-error analysis under Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].’ ” (People v. Loy (2011) 52 Cal.4th 46, 69 [127 Cal.Rptr.3d 679, 254 P.3d 980].) “ ‘The beyond-a-reasonable-doubt standard of Chapman “requires] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.” [Citation.] “To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.” (Yates v. Evatt (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 111 S.Ct. 1884].) Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is “whether the . . . verdict actually rendered in this trial was surely unattributable to the error.” (Sullivan v. Louisiana (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 113 S.Ct. 2078].)’ [Citation.]” (People v. Pearson (2013) 56 Cal.4th 393, 463 [154 Cal.Rptr.3d 541, 297 P.3d 793].)
*774 We cannot determine on this record whether the nonhearsay autopsy photographs and the microscopic slides “would have independently supported [Dr. Fukumoto’s] testimony.” (Dungo, supra, 55 Cal.4th at p. 647 (dis. opn. of Corrigan, J.).) Nor did Fukumoto so limit his testimony. “To prove a torture-murder special circumstance, the prosecution must show that defendant intended to kill and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.” (People v. Streeter (2012) 54 Cal.4th 205, 237 [142 Cal.Rptr.3d 481, 278 P.3d 754].) The prosecutor argued that defendant achieved sexual pleasure from his victim’s suffering, while the defense vigorously urged that defendant did not intend to torture. According to the prosecution, the victim’s injuries reflected that she suffered extreme pain, including the “incisional” tear to her eardrum, the deep furrows in her neck caused by struggling against the ligature, and bruising deep within the body cavity. The defense urged that the evidence reflected the victim was struck in the face and rendered unconscious shortly after strangulation. The defense argued a person intending to torture would not immediately render his victim unconscious and impervious to pain. The condition of the victim’s body was critical evidence. Fukumoto repeatedly recounted Dr. Richards’s statements. As a result, deciding between the prosecution and defense theories depended in great measure on the credibility and accuracy of Richards’s reports.
However, the error is harmless beyond a reasonable doubt in all other, respects. The defense did not contest that the victim had been strangled, instead arguing defendant was not the killer or, alternatively, that he did not act with an intent to torture. Ample evidence aside from Dr. Fukumoto’s testimony supported both first degree felony murder based upon burglary and the burglary-murder special circumstance. The jury could have found burglary based upon an entry with intent to steal or to commit sexual assault. Deeble’s daughter identified jewelry missing after Deeble’s death, supporting an inference that defendant, who knew Deeble and had been in her home, entered the house with intent to steal. Deeble’s body was found without underwear, with her legs spread apart, and her nightgown pushed above her waist. A mousse can was found nearby with apparent blood on it, and a substance found on Deeble’s leg could have been dried semen. These circumstances suggest a sexual assault. Further, defendant’s undisputed commission of a similar murder in Hawaii strongly supported a finding that defendant entered Deeble’s home with a similar intent.
In sum, this case illustrates the difficulty of applying Dungo’s rule allowing admission of testimony regarding “objective facts” derived from an autopsy report by a pathologist who does not testify. The distinction between an admissible statement of objective “fact” and an inadmissible medical “conclusion” is too amorphous to be workable. Application of the confrontation clause *775 should not depend upon a court’s judgment about which side of that blurry line a statement falls. For the foregoing reasons, I would reverse the torture-murder special circumstance and affirm the convictions in all other respects.
Liu, J., concurred.
Appellant’s petition for a rehearing was denied November 13, 2013.

 At the guilt phase, the prosecutor began his questioning of Dr. Fukumoto regarding the autopsy by stating, “I would like to go through with you some of Dr. Richards[’s] specific findings, and I wanted to ask you some questions as well.” The prosecutor then repeatedly asked Fukumoto about Richards’s findings and conclusions. For example, Fukumoto testified that the victim had “a break on the left ear drum which was described by Dr. Richards as incisional in type. ... It is not a tear. It is something that is caused by a sharp instrument or an instrument that has a point.” When asked how Richards described the victim’s ankle lacerations, Fukumoto answered, “He described them as being caused by the wires probably coming together and inflicting the injury.” As to the victim’s nose, Fukumoto testified that “[t]here was a crescent, in other words, in the area of the bridge of the nose, which was consistent to him [(i.e., Richards)] as fracturing of the bridge of the nose.” Fukumoto described Richards’s findings as to the genital region, noting “the area of the vagina shows bruises primarily on the labia and also the vaginal vault” and “[t]here was hemorrhage as well as a laceration in the area of the posterior fourchette.” Fukumoto also recounted that Richards found “mucosal lacerations of the rectum” and that the anus was dilated, though Richards “did not measure it.”
On cross-examination, Dr. Fukumoto confirmed that Dr. Richards did not see in an X-ray that the victim’s nose was broken. Defense counsel inquired how Fukumoto would have performed the autopsy differently from Richards, eliciting that Fukumoto would have taken more measurements, produced more slide samples, and made an incision in the victim’s nose to confirm a break. Defense counsel asked about a notation by Richards on one slide reflecting his finding of an “ ‘underlying submucosal hemorrhage’ ” in the victim’s vagina. Defense counsel elicited that Richards made no notation regarding blood in the vagina or rectum, or damage to the victim’s breasts. Defense counsel also sought clarification regarding Richards’s findings as to the tear of the victim’s eardrum and injuries to her vagina.
On redirect examination, the prosecutor sought to clarify that “Dr. Richards in his summary doesn’t say that there is maybe a fractured nose. He says there is a fractured nose; is that correct?” Dr. Fukumoto agreed. Fukumoto also agreed that Richards’s report “noted an area extending from the mouth over to the lower left cheek that appeared as a residual of adhesive tape.”

 The prosecutor expressly relied upon Dr. Richards’s credibility throughout jury argument. For example, the prosecutor belittled the opinion of defense expert Dr. Wolf regarding the victim’s vaginal injuries. The prosecutor stated Wolf was “quoting literature” in forming his opinions and did not “hav[e] any experience.” The prosecutor noted that “it came out very clearly that he is not a sheriff-coroner, not working for the coroner’s office,” and argued that “[h]e hasn’t seen what Dr. Fukumoto had seen or what Dr. Richards had seen before he retired.” Similarly, with respect to Wolf’s opinion that it could not be determined whether the victim suffered an incision to the eardrum, the prosecutor argued: “Well, the autopsy surgeon who did the autopsy, who is experienced in violent death autopsies says it is not. He talks about other injuries to the ears being tearing. He differentiates between the two. But he said the one injury was from a sharp instrument.” In addressing Wolf’s assertion that the victim’s vaginal injuries could not have been visible to the eye, the prosecutor argued: “When asked then what about the injuries that were visible to Dr. Richards’ eyes? Well, there weren’t any of those. Dr. Richards is wrong. That is the best [the defense] can do on this.”